[Civ. No. 3064. Third Appellate District.—April 28, 1926.]

## MERTIE O. DE MOTTE et al., Respondents, v. JOSEPH ARKELL, Appellant.

[1] LANDLORD AND TENANT — LEASE TO FRATERNAL ORGANIZATION — AGREEMENT TO REPAIR — OBLIGATION OF MEMBERS. — Where the owner of a building leases the second story thereof, together with the appurtenances, to a fraternal organization, under a lease which requires said organization to make all repairs and keep the premises in good order and condition at its own expense, all members of said organization are under obligation to repair said demised premises and keep the same in good condition.

---

1. See 15 Cal. Jur. 695.

[2] ID.—DEFECTIVE GUARD-RAIL—DEATH OF LODGE MEMBER—LIABILITY OF LANDLORD—PLEADING.—In this action for damages for the death of plaintiffs' intestate due to the giving way of a guard-rail around a balcony or platform located at the top of a back stairway, as the result of which the deceased was precipitated to the alleyway below, sustaining injuries which resulted in his death, in view of the fact that the premises in question were leased to a fraternal organization, under a lease which required it to make all repairs and keep the premises in good order and condition at its own expense, and that the deceased was a member of said organization and was on the premises at the time for the purpose of taking one of the degrees for which he was a candidate, the allegations of the complaint setting forth the substance of section 1941 of the Civil Code that the building was intended for human occupation did not present a situation where the common-law rule in relation to the duties and liabilities of landlords to tenants does not apply.

[3] ID.—OBVIOUS DEFECT—ABSENCE OF FRAUD—NONSUIT.—In such action, the deceased, equally with the fraternal organization lessee of the demised premises, having been liable to make all repairs and keep the premises in good order and condition, and the defective condition of the guard-rail which gave way precipitating the deceased to the alleyway below having been open and visible, and there not being anything tending to show either fraud or concealment on the part of defendant (the lessor) at any time, defendant's motion for a nonsuit should have been granted.

(1) 5 C. J., p. 1364, n. 35; 36 C. J., p. 239, n. 38.   (2) 36 C. J., p. 204, n. 55, p. 208, n. 95.   (3) 36 C. J., p. 228, n. 57.

APPEAL from a judgment of the Superior Court of Stanislaus County. J. C. Needham, Judge. Reversed.

The facts are stated in the opinion of the court.

William P. Hubbard for Appellant.

R. R. Fowler and Vernon F. Gant for Respondents.

PLUMMER, J.—Action by plaintiffs for damages on account of the death of William H. De Motte alleged to be

2. Liability of landlord for injury to tenants, see notes in **Ann. Cas.** 1913C, 971; 48 **L. R. A.** (N. S.) 918. See, also, 15 **Cal. Jur.** 704; 16 **R. C. L.** 1034.

due to the negligence of the defendant. Plaintiffs had judgment and the defendant appeals.

The record shows that sóme time during the year 1913 the defendant became the owner of a certain building situated in the city of Turlock, county of Stanislaus, commonly known as "Broadway Hall"; that on or about the first day of October, 1920, the defendant leased the second story of said building, together with the appurtenances thereto, to the Turlock Lodge of Independent Order of Odd Fellows for a term of three years from the said first day of October, 1920. Said lease contained, among other things, the following provision: "That the said party of the first part (being the defendant) shall not be called upon to make any improvements or repairs whatsoever upon the said demised premises, or any part thereof, but the said party of the second part agrees to keep the same in good order and condition, at (its) his own expense." The lease covered the entire second floor of the building, together with all its appurtenances. There was a large entrance and stairway to the hall leading from a street, known as Broadway Street. From this entrance a stairway led to the second story of the building where the hall mentioned was situated. This stairway led up into a wide passageway. Leading down from this passageway was a narrow passageway continuing to the rear side of the building. At the end of this narrow hallway was a door leading to a passageway or platform on the rear of the building. From this platform are stairs leading down to an alleyway. Adjoining the narrow passageway just described was a small room used as an anteroom for the accommodation of candidates awaiting initiation into the secrets of the orders using the assembly-hall. The assembly-hall was well lighted; there were a number of windows in the side of the wall over the alleyway. These lighted the platform at the rear of the building; there was also a light in the small passageway which led to the rear platform. This threw light on the platform when the door was opened. The platform was about 19 feet in length, 5 or 6 feet in width, was constructed of Oregon pine supported by upright posts 4 inches by 6 inches in size and extending above the platform some 3½ feet. To these posts were toe-nailed two guard-rails 2 inches by 4 inches in size and about 9 feet in

length. The upper guard-rail was about 31 inches from the floor of the platform, the lower of the guard-rails was about 12 inches from the upper rail. The platform was about 12 feet above the alleyway. On the evening of June 30, 1922, William H. DeMotte, deceased, entered the Broadway building by the main stairway entrance and ascended the main stairway to the second floor for the purpose of attending a meeting of the Odd Fellows Lodge, of which he was a member, and for the purpose of taking one of the degrees for which he was a candidate. While waiting in the anteroom he suggested to another person in the anteroom that they go outside to get some fresh air and opened the door leading on to the platform, passed out on to the platform accompanied by one Tony Smith. A short time afterward the said William H. De Motte fell to the alleyway below, sustaining injuries which resulted in his death.

The amended complaint sets forth the cause of action in the following language:

"That on said 30th day of June, 1922, and for a long time prior thereto, said guard-rails enclosing said porch or platform were not in good or safe repair, but were insufficient, insecure and unsafe, and in want of repair, in this: that said guard-rails in and about said porch or platform consisted of two pieces of 2x4 lumber placed horizontally and approximately parallel with the floor of said porch or platform, one of said rails being approximately sixteen inches above said floor, and one of said rails being approximately thirty inches above said floor; said rails being supported by wooden posts at each end of said rails. That said rails were not nailed or fastened to said posts except insecurely. at the extreme ends thereof, and were loose at said ends. That said rails were so short that they did not rest, as to their ends, upon said posts. That said rails were composed of warped, shrunken, decomposed and rotten wood and were for the reasons aforesaid, unsubstantial and insufficient, and would not hold nails or spikes, and that said defects were of such a degree that said rails were unfit, unsafe, insecure and dangerous to lean against by persons using due care.

"That said defendant knowingly, carelessly and negligently maintained, kept and permitted, and knowingly, carelessly and negligently caused to be maintained, kept, suf-

fered and permitted said guard-rails to be and remain in said unfit, unsafe, insecure and dangerous condition on the first day of October, 1920, and for a long time prior thereto and thereafter to and including the 30th day of June, 1922, notwithstanding the said defendant had during all of said time complete and full knowledge and notice of said insufficiency and want of repair of said guard-rails at said place, and said defendant carelessly and negligently wholly failed to caution or warn the persons present in said Broadway Hall that said platform or the rails enclosing the same were dangerous, or to provide or place, or cause to be provided or placed, any signs or notices of any kind, warning or notifying the users of said porch or platform that said porch or platform or the guard-rails enclosing said porch or platform were unfit, unsafe, insecure and dangerous, and did negligently and carelessly permit, suffer, and allow human being to use and occupy said porch or platform.''

There were two eye-witnesses to the occurrence, to wit: Antone Smith and W. A. O'Hara. Antone Smith gives the following version:

"It was in the Broadway Hall on the balcony, platform; about half-past nine in the evening; I was waiting in that room and they ·declared a recess to get ready for the ceremony for the first degree and a few of the brothers come out and also Mr. De Motte come out; Yes, sir, come in through the door. Then I was going to stand in the anteroom and he told me, he says, 'Tony, there is a door here, let's see what is out here.' Q. See what is out here? A. Yes. After he opened the door, he noticed the balcony there, or platform, he says, 'Well, it is a platform here, we better be out here, it is a little cooler out here.' We got outside, then we went first the rail— Q. (Interrupting.) Now, what rail, where was the rail that you referred to in regard to this platform, where was the rail that you referred to? A. The rail right straight from the door. Q. what were you and Mr. De Motte doing at that time? A. Leaning up against the rail backwards. Q. Now, in what manner were you leaning? A. We were leaning backwards, this way. Q. Now, when you say 'leaning,' what do you mean, throwing your whole force against it? . . . A. If you will permit, I will show you. Mr. Fowler: Show us. A. He was leaning this way against the rail. I was this way,

cross-legged, talking, Mr. De Motte on my left, leaning about the same way and Mr. Thompson introduced Mr. O'Hara and Mr. De Motte kind of start to make himself acquainted with him, because he was running for auditor, and he stepped ahead just a few steps. Q. Show what he did. A. He was this way, and he stepped ahead and shake hands with Mr. O'Hara and then he pulled out his card and showed him. Q. Who did? A. Mr. De Motte. Q. What did he do with the card? A. He gave it to Mr. O'Hara. Q. What did he say, if anything? A. He says, 'If you mind to take one of my cards. Can you read it?' He says, 'Yes.' Q. What did Mr. O'Hara do? A. He says, 'I saw your card in the paper and I keep the card,' and talking there just a few moments and Mr. De Motte came right back to the rail and as soon as he strike the rail, he dropped back down. I was leaning this way (showing). Q. At the time he fell, are you prepared to state how he was leaning, or how he touched the rail? A. I wouldn't swear how he was leaning, but what I know, he had both feet on the floor. Q. He had both feet on the floor? A. Yes, sir. Q. Did you observe him at any time that evening, sitting on the rail? A. No, sir. . . . Q. Did he sit on the rail? A. No, sir. Q. Was there a light out there? A. There was a light, yes, sir. Q. If Mr. De Motte had been sitting on that rail, would you have seen him? If he had been sitting on it, could you have seen him? A. No, sir —of course, I believe I would have seen him if he was sitting on it. Q. Now, how long were you and Mr. De Motte out there on the platform, leaning against the rail as you have told us, before Mr. O'Hara came out? A. About 5 minutes. Q. About 5 minutes. And how was he leaning at that time, how was Mr. De Motte leaning? A. He was leaning back this way. Q. Just take this—this is the rail here? A. Yes, sir. Q. Will you tell us about how far the rail was from the floor? A. Striking me about here. . . . Q. Just show us about how you leaned. A. I was leaning this way. Q. Leaning that way? A. Yes, sir. Q. Just the weight on one foot and the other crossed over. A. Yes. Q. How, about, was he leaning, if you recall? A. Well, I wouldn't swear the way he was leaning because he stepped ahead and speak to Mr. O'Hara. Q. Well, during the few minutes you were there? A. He was leaning this way. Q. He was

leaning that way? A. Yes, sir. Q. I see. Now, during the time that you and he were in that position, the rail stood your weight all right? A. Yes, sir. Of course we wasn't pressing no weight against there. Q. In other words, the three of you, you and Mr. De Motte still leaning against the rail, talking to Mr. O'Hara. A. Yes. Q. 4 or 5 minutes after he got out there before he fell over. A. Yes, sir, Q. That would make it about 9 or 10 minutes in all. A. Yes. Q. That you and Mr. De Motte were out there? A. Yes. Q. Leaning against the rail before he actually fell over. A. Yes, sir.''

Mr. O'Hara's testimony, so far as it relates to the incident in question, is as follows:

''A. And he just handed me the card and I stepped back like that, the light was shining, and I stepped back to read his card, and just as I glanced at his card, why, he stepped —he handed it to me and I stepped back and he was gone! Q. From the time that he stepped back after handing you his card—from the moment he stepped back, what interval of time elapsed before he was gone, as you state? A. Well, I just held the card, like—he just handed it to me and he stepped back like that, and I just glanced at the card, didn't have a chance to read it or anything, he just stepped back like that and he was gone! Q. I see. Now, when you say he was 'gone,' you mean what? A. He went over backwards. Q. And did anything occur to any portion of the platform at the time he went over? A. Well, the rail, you could hear it, the end of it. Well, what drew my attention to it, Mr. Smith, he jumped forward like that; that is, he jumped forward, I noticed, and I went to grab Mr. De Motte. Q. Grabbed him, you say? A. I tried to reach him, I tried to catch his hands. He threw his hands up like that and I tried to catch him, but he was too far from me. Q. And what became of the rail, if you know, at that time? A. The rail went first; he followed the rail down. Q. Did you hear anything to indicate before Mr. De Motte fell that the rail was going, was there any noise? A. Well, there may have been a little, but not enough to—just might have been a splinter or something like that. Of course, when it started, I heard it, that is what drew my attention to it.''

The testimony further shows that the witness, Antone Smith, was a man of ordinary size and the deceased was a man weighing from 225 to 260 pounds. The testimony further shows that the rear stairway and platform were used for the purpose of taking in refreshments and supplies when the lodge was giving banquets, and taking out the garbage; also, that a piano box was stationed at one end of the platform, and used by the lodge as a coal-bin; that the door leading from the narrow passageway on to the rear platform was equipped with what one of the witnesses called a thumb-lock and was supposed to be kept locked at all times, which was not always done; that the door could be opened from the inside by turning a knob on the lock. It does not appear from the transcript that the rear platform was used for any other purposes than as herein stated, though some of the witnesses testified that they occasionally saw people go up and down the back stairs, but such use was infrequent. The main entrance to the hall and the upper floor of the building where the hall was situated was from the Broadway side of the building and was one in general use for reaching the hall used by the Odd Fellows. It further appears from the record that the deceased was not a member of the Odd Fellows Lodge at the time the premises in question were leased from the defendant, but became a member a short time thereafter. There is some testimony in the record that at the time when the Carpenters' Union occupied the hall, members of the union would occasionally go out on the balcony for the purpose of smoking. It also appears from the record that the lessees of the hall in question permitted other organizations to hold meetings in the hall.

As to the condition of the hand-rails or guard-rails, the testimony is conflicting; that introduced on the part of the plaintiff is to the effect that the rail which gave way was loose, defective, that the porch or platform had warped so that the ends of the guard-rail had drawn away from the posts to such an extent that the guard-rail was loose and would shake when taken hold of. On the other hand, there is testimony to the effect that the guard-rail was secure and sufficient at least for all the purposes for which it was intended. The testimony also shows that during the time the premises were under lease to the Odd Fellows and that

the Odd Fellows procured the services of a carpenter to repair the back porch and stairway; that the carpenter so employed repaired the underpinning of the posts which we have described, made other repairs thereto, made some repairs to the floor of the platform, noticed the condition of the guard-rail, that it was not in what he considered a safe condition, but that he made no repairs thereto, that he simply repaired that portion of the structure in question which he was directed to repair by the lessee. There was testimony to the effect that the posts were decayed at the nail holes where the guard-rails were nailed to the posts. The record shows also that at the time of the execution of the lease, October 20th, the defendant and a Mr. Ferguson, the representative and person acting for the Odd Fellows Lodge, made an examination of the premises, including the back stairway and platform, and also the suitability of the platform for the location of a coal-box. The testimony on the part of the plaintiff was to the effect that the back porch, including the guard-rails, was in a defective condition as described at the time of the lease and remained so during all the period of time embraced in the controversy. At the conclusion of the plaintiff's case, the defendant moved for a nonsuit upon the ground of contributory negligence, that the use made of the platform and guard-rail was not such as was intended at the time of the lease, that the premises were leased to and under the control of the Odd Fellows Lodge, of which deceased was a member under a written lease which expressly provided for the making of repairs and the keeping of the same in good condition by the lessee. The defendant's motion for a nonsuit was denied, after which the defendant introduced testimony tending to show that the guard-rail was in good condition and suitable for the purpose for which it was intended at the date of the lease.

It is contended upon this appeal that the defendant's motion for a nonsuit should have been granted and, further, that the judgment against the defendant is unwarranted by the facts.

While the complaint alleges negligence on the part of the defendant in maintaining a defective guard-rail during all the period of time elapsing between the execution of the lease until the date of the death of the deceased, there is

nothing in the complaint alleging, nor is there anything in the record showing or tending to show either fraud or concealment on the part of the defendant at any time. If the allegations of the complaint are true, a clear case of obvious defects is established, even though it is alleged that the deceased was unaware of such defects. The complaint does not allege any latent defects, but is based solely upon the fact of the continuing defects which we have mentioned, and the lack of knowledge thereof on the part of the deceased. The complaint omits mention of the fact that the premises in question, including the porch and stairway, were under lease to the Odd Fellows Lodge, of which the defendant was a member, but apparently counts upon the fact that the Broadway Hall, as alleged in paragraph 4 of the complaint, was "used for human occupancy and at divers times and with great frequency during said period of time last aforesaid, with defendant's knowledge, consent and permission, divers persons gathered, assembled and met therein; and public and semi-public gatherings, audiences, meetings, congregations and assemblages of human beings were, with defendant's knowledge, consent, permission and approval, had and held in said rooms, compartments, apartments, and/or halls on said second story or upper floor of said Broadway Building," and invokes the rule applicable to injuries of third persons where the premises had been leased for amusement or public purposes. That the lessee may have let the premises for some public purpose or purposes does not alter the situation here. [1] The premises were leased to the Odd Fellows Lodge, of which the deceased was a member, which renders all members of the Odd Fellows Lodge leasing the premises tenants under obligation to repair the premises and keep the same in good condition. This is not a case involving injury to anyone other than a tenant and we need not discuss the law relative to the rights of third persons where halls leased for amusement or public purposes, in fact may be involved. The lessee in this case was a private fraternal organization composed of a limited, known, and accepted membership, each one having equal rights and liabilities and the hall was not a place and was not at the time used as a place for the assembling of the general public. This is not a case of the visiting by a patron of a public amusement place, but

is a case of a use thereof, which was for the private convenience of the tenants for a limited purpose. If it were a case where the premises were leased for a public use, then the rule would apply that the lessor of property intended for a public use is not liable for injuries received on account of the defect in that portion of the premises intended only for private use. There is nothing in the record in this case that shows that the back stairs and balcony were intended for public use, in the sense of the word in which that word is ever used in applying to a place or premises leased for public or amusement purposes. The wide stairway leading from Broadway Street is shown to be the only one intended for general use in reaching the hall in question, irrespective of the purpose for which the hall at the particular time was being used. (See note to *Morong* v. *Spofford,* L. R. A. 1915B, p. 387.) That the leasing of premises to a lodge does not bring it under the rule applying to injuries arising where the premises are leased for amusement purposes, see note to *Feeley* v. *Doyle,* L. R. A. 1916F, pages 1123–1129; see, also, *Jordan* v. *Sullivan,* 181 Mass. 348 [63 N. E. 909], in which the action was based upon an allegation of a failure to properly light the entrance of a public hall and the defendant was injured by falling over a step therein. The supreme court of Massachusetts thus states the law. We quote from the syllabus: "Where an owner of a building let a hall for the installation of a lodge, agreeing to light and heat the same, and a party, in entering the building to attend the ceremonies, fell, and was injured, owing to the insufficient lighting of the entrance thereto, she could not recover for her injury from the owner, being at most an invited guest of the lodge, and as such having only the rights against the owner which the lodge itself would have had, and the lodge not having any right to complain that a gas jet should have been put in to light the entrance, it having rented the building without such jet being in."

[2] The allegations of the complaint setting forth the substance of section 1941 of the Civil Code that the building was intended for human occupation does not present a situation where the common law in relation to the duties and liabilities of landlords to tenants does not apply. As set forth in 15 Cal. Jur. 704, "in the absence of fraud,

concealment, or covenant in the lease, a landlord is not
liable to a tenant for injuries due to the defective condition
or faulty construction of the demised premises. This is
the rule at common law, and it has not been changed by
section 1941 of the Civil Code." (*Willson* v. *Treadwell,*
81 Cal. 58 [22 Pac. 304]; *Van Every* v. *Ogg,* 59 Cal. 563.)
In *Gately* v. *Campbell,* 124 Cal. 520 [57 Pac. 567], the
supreme court having to do with a similar question thus
states the law: "The controlling question left in this case
is whether or not the landlord, in the absence of fraud,
concealment, or covenant in the lease, is liable to the tenant
for an injury suffered by him during his occupancy by
reason of the defective condition or faulty construction of
the leased premises. At the common law the lessor is not
liable for such injury. (*Keates* v. *Earl of Cadogan,* 10 Com.
B. 591; *Howard* v. *Doolittle,* 3 Duer (N. Y.), 464; Taylor
on Landlord and Tenant, secs. 175a, 382.) And this court
has often laid down the same rule. (*Brewster* v. *De Frem-
ery,* 33 Cal. 341; *Van Every* v. *Ogg,* 59 Cal. 565; *Sieber* v.
*Blanc,* 76 Cal. 173 [18 Pac. 260]; *Willson* v. *Treadweli,* 81
Cal. 58 [22 Pac. 304]; *Daley* v. *Quick,* 99 Cal. 181 [33
Pac. 859].)" In *Robinson* v. *Leighton,* 122 Me. 309, 30
A. L. R. 1386 [119 Atl. 809], a case involving liability
between landlord and tenant, the rule is similarly stated
as follows: "A rule similar to that of *caveat emptor* apply-
ing, it certainly may be defined as a general proposition
applicable to premises actually let, that the lessor, in his
relation to the lessee, does not warrant their condition, and
that he is not liable for any injury suffered by the tenant
during his occupancy by reason of defects. There must
be proof of exceptional circumstances to make the landlord
liable in such cases; some proof of fraud or misrepresenta-
tion, or direct concealment of a fact known to the lessor,
which the lessee did not have any reasonable opportunity of
discovering. There must be proof of some direct omission
by the lessor, of the performance of a duty which he owed
to the lessee, in order to make the landlord liable. *Libbey*
v. *Tolford,* 48 Me. 316 [77 Am. Dec. 229]; *McKenzie* v.
*Cheetham,* 83 Me. 543 [22 Atl. 469]; *Whitmore* v. *Orono
P. & P. Co.,* 91 Me. 297 [64 Am. St. Rep. 229, 40 L. R. A.
377, 39 Atl. 1032]; *Bennett* v. *Sullivan,* 100 Me. 118 [60

Atl. 886, 18 Am. Neg. Rep. 108] ; *Hill* v. *Day,* 108 Me. 467 [Ann. Cas. 1913C, 971, 81 Atl. 581]."

In the note to *Hill* v. *Day,* Ann. Cas. 1913C, 971, following the decision in that case setting foth the rule in accordance with what has been said, the commentator used the following language: "It is held in the reported case that unless there is an express covenant, the lessor does not warrant that the premises are fit for use and he is not obliged to keep them in repair, 'but the tenant, on the principle of *caveat emptor,* and in the absence of any fraud on the part of the landlord, takes the property in the actual condition in which he finds it,' and therefore the plaintiff cannot recover damages for personal injuries caused by the fall of a ceiling. The case of *Kabus* v. *Frost,* 50 Super. Ct. (N. Y.) 72, supports the principle laid down in the reported case. In that case it appeared that a written lease provided for certain repairs, but there was no reference made as to repairing the ceiling. The plaintiff brought an action to recover damages for personal injuries caused by the fall of the ceiling, and the court, dismissing the action, said: 'There is no implied warranty or obligation on the part of the landlord that the premises were in a safe condition for use, or that they would not become unsafe.' See, also, *Ross* v. *Pizer,* 132 App. Div. 696 [117 N. Y. Supp. 404] ; *Miller* v. *Rinaldo,* 21 Misc. Rep. 470 [47 N. Y. Supp. 636] ; *Kennedy* v. *Fay,* 31 Misc. Rep. 776 [65 N. Y. Supp. 202] ; *Garcewich* v. *Ascherman,* 129 N. Y. Supp. 418." In the case at bar there is not only an absence of a covenant to repair, but an express covenant in the lease that the tenant shall make all repairs and that the landlord shall not be called upon to make any repairs during the continuance of the lease. The implied knowledge of the defective condition on the part of the landlord in this case is supported by the argument that an examination would have readily disclosed the condition of the guard-rail and the necessity for repairs. This, however, does not change the situation. In *Toner* v. *Meussdorffer,* 123 Cal. 462 [56 Pac. 39], the court, speaking through Justice Temple, answers said argument: "The assertion is little more than what would be called *simplex commendatio,* rather than a representation, had defendants themselves been the landlords. The duty of making an examination

rested as much upon the lessee as upon the landlord, and to all such transactions the rule of *caveat emptor* applies. It is not averred that the lessee abstained from making an examination because of the representations, and clearly he would not have been justified in refraining from so doing in reliance upon such an assertion.'' In *Daley* v. *Quick,* 99 Cal. 179 [33 Pac. 859], the court quoted from *Baxter* v. *Roberts,* 44 Cal. 187 [13 Am. Rep. 160], and sets forth the duty of the lessee to make an examination as follows: ''It is as much the duty of the lessee to satisfy himself that the premises are safe as it is of the lessor to make them so; and when it would appear from an examination, such as an ordinarily prudent man would make before venturing to reside in or upon the premises, that they were unsafe, and the defect rendering them so discernible, the lessee is presumed to have had notice of such defect and accepted the risks incident thereto if he occupies the premises.''

From the fact that the deceased was a member of the tenant lodge and thus one of the tenants, we do not deem it necessary to discuss or review the cases having to do with injuries sustained by third persons, and, also, in view of the further fact that the landlord surrendered control of the platform and stairway to the lessee, it is not necessary to review the cases relating to the landlord's liability under such circumstances. We will, however, cite a few of the cases having to do with the misuse of platforms and guard-rails in cases where the landlord actually retains control. In the case of *Kelley* v. *Lawrence,* 195 Mo. 75 [92 S. W. 1158], where a servant was injured by leaning against the guard-rail along the side of a four-foot viaduct, which was used as a passageway, the court considered the question in this manner: ''The floor of this viaduct was four feet wide, and it was such floor that was designed as the passageway or walkway for the use of employees in going to the buggy room or returning therefrom, and so long as plaintiff was walking upon this floorway or standing upon it he was entirely safe, and it was not until he undertook to improperly use the banister or railing which was placed on either side of this walk, for a purpose for which such banister or railing was not intended or designed, that he was in any danger of being injured. That this

railing or banister on either side of this viaduct was not placed there to be used as a seat or resting place for employees in using such viaduct, is too plain for discussion. No one will seriously contend that in the placing of that railing or banister on either side of the viaduct that it was designed for any other purpose than simply a guard rail and to prevent those who should use the viaduct in an ordinarily careful manner from being hurt.'' In that case the plaintiff and another person started to cross the viaduct and after proceeding a short distance stopped, engaged in conversation and the plaintiff started to sit down on the railing, which gave way and precipitated him to the ground beneath, causing serious injuries, for which suit was instituted. It was held that the defendants were not liable. In *Offutt* v. *O'Leary,* 204 Ky. 726 [265 S. W. 296], the court of appeals of Kentucky states the rule as to the use of premises for a different one than intended as follows: ''It is equally clear that the liability of the landlord does not extend to injuries occasioned by defects in the portions of the premises not intended to be used as an entrance, exit, or passageway. . . . This rule would not, however, apply to a hidden defect so contiguous to a path as to form a trap for the unwary traveler using it in the ordinary manner.'' To the same effect is *Morong* v. *Spofford,* 218 Mass. 50 [L. R. A. 1915B, 387, 105 N. E. 454], where the injured person used a back stairway instead of a front stairway, which was the one provided for giving access to the part of the building sought to be entered. In the case of *Pavlovchik* v. *Lupariello,* 101 Conn. 567 [127 Atl. 18], the testimony showed that a woman weighing 200 pounds leaned forward at the edge of a porch against a railing and pulled on a clothesline. The railing gave way and the plaintiff fell and was injured. The landlord was held not liable by reason of the misuse being made of the railing by the plaintiff. In *Glain* v. *Sparandeo,* 119 La. 339 [44 South. 120], the plaintiff attempted to lower a dresser from a platform or balcony at the rear of a building, leaned against a guard-rail, which gave way, resulting in a fall and injury to the plaintiff. The defendant was held not liable. In the case of *Kinney* v. *Onsted,* 113 Mich. 96 [67 Am. St. Rep. 455, 38 L. R. A. 665, 71 N. W. 482], the supreme court of Michigan held that the

defendant was not liable where the plaintiff had leaned against a guard-rail on a passageway and was injured by reason of the guard-rail giving way, on the ground that the plaintiff was putting the guard-rail to a use which was not intended. In deciding that case the court refers to the case of *Stickney* v. *Salem,* 3 Allen, 374, as follows: "In *Stickney* v. *Salem* the action was against the city for injuries resulting to deceased caused by leaning against a fence or railing which marked the terminus of the street, and was built upon the top of a seawall. The plaintiff, in company of a friend, had walked to this point to view the sea, had turned his back and leaned against this railing, which gave way, because of defects, and he received serious injuries. The court says: 'The fact that the railing was defective and would have proved an insufficient barrier in case it became necessary for a traveler to use it for a legitimate object is wholly immaterial. It is a sufficient answer to the plaintiff's case that the defendants were not bound to keep the railing in repair for the purpose for which it was used by the deceased at the time of the accident," citing *Orcutt* v. *Kittery Point Bridge Co.,* 53 Me. 500.

In *Robinson* v. *Leighton, supra,* the plaintiff was injured in making use of a fire-escape in a manner other than that intended and for a purpose other than for which it was constructed. Judgment was for the defendant. The notes to that case collect a number of cases supporting the rule above stated. It thus appears that if the duty had devolved upon the defendant to make repairs to the balcony, stairway, and guard-rail, the use at the time of the injury must have been such as was contemplated at the time of the lease and for which the back porch, balcony, and guard-rail were constructed. At the time that the guard-rail gave way, the witness Tony Smith was leaning against one portion thereof. Prior to the time that the deceased stepped forward to give the witness O'Hara a campaign card, both the deceased and the witness Smith had been leaning against the guard-rail. Each was standing, as described by a witness, upon one foot, with the other crossed over and had been in such position for some minutes, when two others appeared upon the porch and the deceased was introduced to O'Hara and again stepped back to the railing.

Just what force was exerted by him against the railing does not appear. The witness Smith does state that they were not leaning heavily against the railing and that the deceased did not sit down upon the railing. The weight of the witness Smith does not appear in the record further than he is stated to be a man of average weight. The weight of the deceased was given at between 225 and 260 pounds. It thus appears that two men weighing together in the neighborhood of 400 pounds were standing leaning against the railing for some minutes, that one of them remained leaning against the rail until it gave way, and that the other stepped back against it just preceding the instant of time when the railing broke loose. Irrespective of the actual pressure exerted by the two men against the railing, it is clear that the guard-rail was not intended to be used for leaning against, nor was the platform or balcony erected as a place to be used for lounging or social purposes. Where it is shown that a back porch or balcony is being used for the purpose for which the same was erected, then the weight or pressure brought against a guard-rail as to whether it was reasonable or unreasonable, or any greater than should have been anticipated, becomes purely a question for the jury; also, in cases where there is any conflict in the evidence as to whether the intended and contemplated use is being made of the stairway and balcony. [3] The facts appearing in the transcript, in view of the law which we have cited, show that the defendant's motion for a nonsuit in this case should have been granted. The appellant argues error on the part of the trial court in the giving and refusing of instructions. As the judgment must be reversed, from the fact that we have fully set forth the law applicable to this case, it becomes unnecessary to review each assignment of error. However, in view of what we have said, we think the trial court will experience no difficulty as to any further questions relating to instructions. The judgment is reversed.

Hart, J., and Finch, P. J., concurred.

A petition by respondents to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 24, 1926.