[Civ. No. 6090. Third Appellate District.—August 21, 1939.]

SAN JUAN GOLD COMPANY (a Corporation), Respondent, v. SAN JUAN RIDGE MUTUAL WATER ASSOCIATION (a Corporation) et al., Appellants.

Walter M. Gleason for Appellant.

Jones & Finnegan and Carl A. Onkka for Respondent.

PAULSEN, J., *pro tem.*—This action was instituted to quiet title to and enjoin the use of certain portions of a water distribution system known as the Shady Creek Dam and the Pine Grove Reservoir. From a judgment granting such relief defendants prosecute this appeal.

Appellants admit respondent's ownership of the property but claim that they have acquired a prescriptive right therein for the diversion, conveyance and temporary storage of waters owned and used by them for hydraulic mining operations. The principal questions involved arise out of the assertion of such rights by the defendants Moulton, Clerkin and Harris, who, for convenience, will be referred to herein as the appellants. The other defendants claim under them and as to most of the points raised no separate discussion of their problems is required.

The trial court found, in substance, that appellants had entered the property as tenants of respondent's predecessors in interest under and by virtue of a lease granting the use of said facilities for domestic and irrigation purposes and that no rights to use them for mining purposes had been gained. Appellants have directed their major attack against these findings, arguing that the "indisputable evidence" compels a contrary conclusion. Stating the evidence in the light most favorable to the respondent, as we must on this appeal, the following statement of facts appears to be clearly justified.

Lying between the middle and south forks of the Yuba River in Nevada County is a mountainous region commonly known as the San Juan Ridge. This area is traversed by several streams and in it are a number of small communities. Respondent's predecessors in interest were the owners of an extensive water system which consisted of ditches, tunnels, flumes and other such works and included the dam and reservoir involved in this action. The system was originally constructed to furnish water to the many hydraulic mines then operating in the section. After the decline of this type of mining following the issuance of an injunction against the filling of rivers and valleys with tailings, this system was operated as a public utility and was used to furnish water to the inhabitants of the San Juan Ridge for domestic, irrigation and mining purposes. In time the revenues of this service diminished to such an extent that after a contested hearing

before the California Railroad Commission that body issued an order allowing the public utility to discontinue it. As part of that order the commission approved a proposal to lease the system to the consumers of the area.

Prior to the hearing before the railroad commission, said consumers started to form an organization called the San Juan Water Users Association. To distinguish this organization from the corporate defendant in this action, it was referred to throughout the trial as the "Old Association" and when necessary will be so referred to herein. It was represented at the hearing before the commission and after the order was made recommending the lease the organizers of the association met and elected E. B. Dudley, Kate Sullivan and I. W. Musfield to take the lease for the benefit of the members of the association, its being understood and recognized by all the parties concerned that in so doing the persons so named as lessees were to act simply as trustees for all the members. On June 6, 1927, the lease was executed as planned. Omitting the descriptions, names of parties and other matters not material to the consideration of this appeal, the lease provides:

" 'Lessors' hereby lease . . . and the undersigned Lessees take and hire from the Lessors, for the term and on the terms and conditions hereinafter set forth, . . .

"For the term of one year from date of this lease and thereafter from year to year, until terminated as hereinafter provided, upon the following terms and conditions, to which the Lessors and Lessees hereby agree:

"(1) The lease is made for the sole purpose of enabling Lessees to provide for the continuance of a water supply for domestic and irrigation purposes to water users on the San Juan Ridge, and it shall become terminated as to all or any part of the leased properties if and whenever the Lessees shall cease to use the same for such purpose. The Lessors agree that the Lessees shall not pay any money rental under this lease to the Lessors or either of them.

" (2) Lessees will hold the Lessors harmless of and from . . . any work or labor done or materials furnished in or about the maintenance or repair of the said leased properties, . . .

" (3) It is expressly understood and agreed that Lessees do not undertake any obligation or liability to Lessors or either of them to keep up, maintain, repair or reconstruct said leased properties, either in their present condition, or otherwise, or

at all, and that the Lessees may in their discretion and without responsibility, or liability to the Lessors or either of them, determine what, if any, upkeep, maintenance, repair and/or reconstruction shall be done or undertaken by them, and may make and install repairs and structures of a different size and/or character for the conveyance of water, or may permit said system to fall into a state of disrepair; provided only Lessees shall pay for all such work, labor and materials as they may in their discretion provide or install or undertake to provide or install upon the leased premises, and shall hold the Lessors and the leased premises harmless against any lien or liability therefor or arising therefrom; and provided, further, that Lessees agree to repair and make good all damage and injury caused by wanton and malicious acts of Lessees or of said water users or any of them, and to be responsible and liable to Lessors therefor.

"(4) Lessors reserve the right, for themselves, their successors and assigns, to enter upon said leased premises at any and all times, for the purpose of inspecting the same, or for the purpose of doing any work of maintenance, repair or reconstruction thereon they may consider desirable. The cost of any such inspection or work done by Lessors during the term of this lease shall be borne solely by Lessors, their successors or assigns, and shall not be charged or chargeable to Lessees or to the water users taking water from said system for domestic or irrigation use. It is, however, definitely understood and agreed that Lessors do not agree or undertake to make any such inspections or do any such work whatsoever.

"(5) In case Lessors, their successors or assigns, shall desire to use the said leased properties or any part thereof, in connection with any mining operations upon properties now or hereafter owned by or under lease to the Lessors or either of them, or owned by or under lease to any corporation, partnership or person affiliated in interest with the Lessors or either of them, or to make any lease thereof in connection with such mining operations, then Lessors, their successors or assigns, at their option may retake possession of all or any part of the said premises upon six (6) months' notice in writing to the said Lessees, and thereupon this lease shall be and become forthwith terminated and cancelled as to such property so retaken by Lessors, their successors and assigns. Upon any termination of this lease, Lessees shall surrender to Les-

sors, their successors or assigns, possession of all or such part of the leased properties as may be designated in such notice. Provided, however, that in the event of the termination of this lease upon the circumstances hereinbefore in this paragraph (5) provided, and the retaking of possession of all or any part of the said premises pursuant to such provisions, the Lessors, their successors or assigns, shall nevertheless permit the conveyance of water, in the amounts theretofore conveyed, by means of said canal system from the point or points of intake to the most westerly point on that part of the canal system which shall have been retaken, and the delivery at such points to the Lessees, it being expressly understood, however, that the Lessors, their successors and assigns, shall not thereby become obligated to maintain said canal system or to keep the same in repair; provided, further, that the Lessees shall pay annually to the Lessors, their successors or assigns, such reasonable charge for the conveyance and delivery of said water as may be agreed upon between the parties or, upon their failure to agree, as may be determined by the Railroad Commission of the State of California.

. . . . . . . . . . . . .

"(7) Neither this lease nor any interest thereunder shall be assignable by the Lessees or any of them without the written consent of the Lessors first had and obtained; provided, however, that the Lessors hereby agree to give their written assent to the assignment of this lease to such association or corporation as may be formed or organized by or in the interest of the water users on the San Juan Ridge and for the purpose of supplying water for domestic and irrigation purposes to such water users. This lease shall bind and inure to the benefit of the successors and assigns of the Lessors and the permitted assigns of the Lessees; but it shall not pass by will or inheritance to the heirs, legatees or devisees of any of the Lessees."

It will be noted that although the lease contains no provision designating the lessees as trustees it is clearly indicated that its purpose was to provide for the continuation of the water service to the consumers. Shortly thereafter, by-laws were adopted and signed by a large number of said consumers, including the appellants and the lessees named. The by-laws set forth the essential features of the organization, named the officers to be elected, specified their duties and made provi-

sions for the distribution of water by the association. Appellants took an active part in these proceedings. Moulton was president and later Clerkin was elected to succeed him and there was evidence to the effect that he held this office as late as 1930. There was also, it is true, evidence offered to show that the association was disbanded in 1929 but in sharp conflict with it was very convincing testimony that it functioned until 1935 or later. There was also testimony that Moulton was elected water supervisor and in that capacity was given full control and supervision over the water system; that he was elected to this position again in 1931. The by-laws provided that such officers should hold office until their successors were elected. Our attention has been called to no evidence showing that Moulton ever resigned from that office and there was testimony to the effect that a meeting was held in July, 1935, and a new water supervisor was then elected.

■ Appellants contend that the lease was void for want of consideration and that no legal organization of the association was ever perfected capable of taking title as lessees thereunder. As to the question of consideration, the lease being in writing, it is to be presumed that there was a valid consideration for it. (Civ. Code, sec. 1614.) The burden of showing a want of consideration rested upon appellants. (Civ. Code, sec. 1615.) So far as we are advised there was no evidence to support appellants' position, other than the lease itself, and this alone was not sufficient. ■ Moreover, it is immaterial under the facts shown here whether there was a valid consideration or not. Inasmuch as appellants recognized the validity of the lease for the purpose of gaining possession and control over the water system they are estopped to deny the relation of landlord and tenant in so far as it related to their actions and rights at that time. (15 Cal. Jur. 642; 35 C. J. 1249.)

■ Nor are we impressed with the argument that no legal organization capable of taking the lease was ever formed. Appellants and others brought about the execution of the lease through trustees for their own benefit; they signed by-laws which constituted—at least as among themselves—a contract for the operation of the property; they had a recognized membership roll. Respondent and its predecessors have at all times recognized the members of the association as the parties beneficially interested under the lease and thereby permitted

them to gain control and operate said property. Under these circumstances, appellants are estopped from taking the position that they had no legal rights as members of the association. (15 Cal. Jur. 648.) Furthermore, it is well settled that a valid grant may be made to trustees for an unincorporated voluntary association. (*Ruddick* v. *Albertson,* 154 Cal. 640 [98 Pac. 1045].) It has also been held that where property is leased to trustees under such circumstances the members of the association become tenants of the lessor. (*De Motte* v. *Arkell,* 77 Cal. App. 610 [247 Pac. 254].)

As to the question of prescriptive rights, respondent contends that as appellants entered the premises under the lease they are now estopped to deny their landlord's title. But while this is the general rule, there are well-recognized exceptions to it. By its pleadings respondent has done more than assert its right to possession; it has tendered the issue of title not only at the time of the execution of the lease but also at the time of the commencement of the action and has demanded that appellants set forth their adverse claims, if any they have. Respondent has at all times contended that this is an action to quiet title and, as will more fully appear hereafter, has defended the provisions of the judgment on that theory. When a landlord by his pleadings not only seeks to recover possession, but also to quiet his title, the tenant is not estopped to deny his title but may set up his own superior title. (*Hambey* v: *Wise,* 181 Cal. 286 [184 Pac. 9] ; *Collier* v. *Johnson,* 79 Cal. App. 322 [249 Pac. 217].) It should also be observed that appellants have not denied the ownership of respondent as of the date of the lease.

Turning now to the question of the sufficiency of the evidence to support the claim to prescriptive rights we find it unnecessary to discuss the evidence as it related to the whole period under consideration. In November, 1931, the corporate defendant herein, San Juan Ridge Mutual Water Association, was organized by appellants. It is conceded that this corporation was not in existence long enough to acquire adverse rights and for the purposes of this discussion it may be assumed that it would otherwise have done so. It is admitted that if Moulton, Clerkin and Harris did not hold adversely prior to November, 1931, then the case must fall as to all the defendants in the action. We may, therefore, confine our consideration of the evidence to the period ending on that date.

It was contended by appellants that they had used these water facilities adversely and under claim of right for mining purposes even prior to the execution of the lease and that this applied in particular to appellant Moulton, but their testimony on this point is directly and positively contradicted by the testimony of Herbert Thomas who had been in charge of the water system for respondent's predecessors for many years and up to the time of the execution of the lease. Thomas testified that none of the appellants ever used water from the dam or reservoir without his express permission. If the trial court believed this witness it was justified in holding that appellants had not used the water under an adverse claim prior to the execution of the lease and this court would be bound by such a finding.

As to the period between June 6, 1927, and November, 1931, it has been demonstrated that appellants went into possession as tenants under the lease and that there was ample evidence to support the conclusion that they exercised complete control over it by virtue of their positions as members and officers of the association, entirely negativing their claims to a hostile and adverse possession.

Appellants attempt to meet this situation by arguing that the instrument was not a lease at all but simply a revocable license by which they had possession for limited uses; that is, domestic and irrigation purposes; that this was a license to use the dam and reservoir for these purposes only and that when they asserted a right to use them for mining purposes they acquired an easement not contemplated or provided for by the license. While we are of the opinion that this theory, if correct, would not, in the light of the evidence adduced, establish their claims, or prove that the use was other than permissive, we do not rest our conclusions solely on that basis. We are satisfied that this instrument is what it purports to be—a lease. It is so denominated and this is some evidence of its character. (*Harrelson* v. *Miller & Lux, Inc.,* 182 Cal. 408 [188 Pac. 800].) But it meets the other requirements of such an instrument.

"The test to determine whether an argument for the use of real estate is a license or a lease is whether the contract gives exclusive possession of the premises against all the world, including the owner, in which case it is a lease, or whether it merely confers a privilege to occupy under the owner, in

which case it is a license, and this is a question of law arising out of the construction of the instrument." (*Shaw* v. *Caldwell,* 16 Cal. App. 1 [115 Pac. 941].)

The instrument under consideration grants all the right, title and interest in the property to the lessees who hire it for the term prescribed. While the purposes of the use are set forth no right to possession *for any purpose* is reserved to the lessors. Provision is made for the right to enter for the purpose of making repairs and inspections. Unless the lessors or persons acting under their authority have use for the property for mining purposes they cannot cancel the lease, and then only after six months' notice. Even in that case they recognize the rights of the lessees to the water under certain conditions. These and other provisions show conclusively that the instrument is a lease for a limited purpose. ■ A lease for a term of years is more than a mere license to enter and occupy for a given purpose, but it has the effect of a conveyance for the term specified. (*Chandler* v. *Hart,* 161 Cal. 405 [119 Pac. 516, Ann. Cas. 1913B, 1094].) It must be admitted that by implication the use of the premises for mining purposes is prohibited, but there is no provision that such use of itself terminates the lease and there is no evidence that respondent has attempted to do so. Assuming, without deciding, that under proper circumstances, it might be possible for a lessee who holds for a limited purpose, to gain a prescriptive right to use the same premises for another purpose, there can be no question but that the evidence in this case falls short of the requirements.

"Inasmuch as the doctrine of adverse possession is to be construed strictly, and such possession cannot be made out by inference, but only by clear and positive proof, the burden of proving all the essential elements of adverse possession or prescriptive title is upon the party relying upon it." (1 Cal. Jur. 636, sec. 95; *Clarke* v. *Clarke,* 133 Cal. 667 [66 Pac. 10].)

■ We need not discuss all the essential elements here; or the evidence relating to them. Respondent contends that the evidence shows that the possession and use were either permissive or clandestine and with this we agree. The burden was on appellants to prove otherwise and this was an issue of fact for the trial court. As appellants went into possession under the terms of the lease, their use of the premises, even for mining purposes, was presumed to be at least by

acquiescence of the owner and its mere knowledge, if any, of the use for mining purposes raised no presumption of a hostile or other claim of right. Occupancy is presumed to be under the lease until some unequivocal act gives notice of a changed attitude, and these are questions of fact for the trial court. (*Clarke* v. *Clarke, supra*; *Storrow* v. *Green*, 39 Cal. App. 123 [178 Pac. 339].) ■ There was no evidence that the appellants had done anything to communicate their claim of right to the owners prior to November, 1931, but they rely upon the fact that certain of their acts must be held, as a matter of law, to have put the owners on notice as to the hostile nature of the use for mining purposes. These acts consisted of improvements made by appellants on the water system and the use of said water for mining purposes. It will be observed that the lease provided for the making of such improvements and it is obvious that acts performed by permission under the lease could not be considered hostile. We have already shown that the use for mining purposes raises no presumption of a hostile claim in the absence of other evidence and it must be recalled that if appellants were lawfully in possession of the dam and reservoir their presence there and their use of such facilities could not be construed as hostile acts. Inasmuch as we are satisfied that the evidence supported the implied finding that appellants' claims were not hostile and that their use of said facilities were by permission of the owners, the claims of appellants cannot be upheld.

Before taking up the other points raised, it should be pointed out that while the dam and reservoir involved in this action are, and for many years have been, used as parts of the whole water system, respondent claimed no interest in the rest of the system or in the water rights. Some time after the execution of the lease it acquired title to the dam and reservoir only.

A demurrer, both general and special, was interposed to the complaint and the overruling of it is assigned as prejudicial error.

The complaint sets up two counts, the first against Moulton, Clerkin and Harris and the second against the remaining defendants. In the first it is alleged, in substance, that plaintiff is and for a long time has been the owner of the property, describing it; that one of plaintiff's predecessors was a cor-

poration; that its predecessors executed the lease in favor of the named lessees and consented to the assignment of it to the consumers; that the lease is marked as an exhibit and is made a part of the complaint; that the association and the members thereof, including the defendants, entered into possession by permission and under the terms of the lease; that the permission given was for use of the water facilities for domestic and irrigation purposes only. The complaint then continues:

## "V.

"That defendants, W. E. Moulton, W. P. Clerkin and F. M. Harris, their known agents and servants, did on or about the 17th day of February, 1936, and on various other days between that time and time of commencement of this suit, forcibly enter upon the Pine Grove Reservoir, contrary to the terms of said lease, and forcibly break the gate to said reservoir and the chain and padlock holding said gate, and used and continued to use the water stored in said reservoir for mining purposes.

## "VI.

"That daily since on or about the 17th day of February, 1936, the said defendants, W. E. Moulton, W. P. Clerkin, and F. M. Harris, have entered upon the said Pine Grove Reservoir and the Shady Creek Dam and broke the gate and dams of said reservoir and dam, and used the water stored therein for mining purposes and otherwise suffered and committed waste on the premises in violation of the terms of said lease and without the consent of plaintiff.

## "VII.

"That the said defendants, W. E. Moulton, W. P. Clerkin and F. M. Harris, are about to, and will unless restrained by this Court, commit further waste in this, the said defendants threaten to continue to forcibly enter upon said premises and to use the water and real property stored therein and to drain the said Dam and Reservoir against the permission and consent of Plaintiff.

## "VIII.

"That said entry of defendants and the use of said real property has caused and does cause to this plaintiff continuous and daily damage, the amount thereof, plaintiff is unable to determine or calculate."

In the second count the facts of ownership are stated as in the first count and it is then alleged as follows:

"II.

"That on or about the 17th day of February, 1936, the defendants, San Juan Ridge Mutual Water Association and Frank Homer and John Doe Furness, their known agents and servants forcibly entered upon said Pine Grove Reservoir and Shady Creek Dam and forcibly opened and broke the gate to said reservoir and the dams of said reservoir and dam, and took and used water therefrom.

"III.

"That said defendants continue to enter and to use the water stored in said reservoir and to trespass on said real property and unless enjoined, threaten to continue to so trespass to the irreparable damage of defendant.

"IV.

"That the continuance of said acts of said defendants San Juan Ridge Mutual Water Association, Frank Homer and John Doe Furness aforesaid, will enable said defendants, unless restrained therefrom, to acquire an easement in and upon the said land and premises, and the use thereof for said purposes, adverse to this plaintiff

"V.

"That the said entry of defendants last named and the use of said real property has caused and does cause to this Plaintiff continuous and daily damage, the amount thereof plaintiff is unable to determine or calculate.

"VI.

"That the acts aforesaid of defendants are unlawful and if they are permitted to continue their acts aforesaid, great and irreparable injury will be done to plaintiff."

Certain other allegations are made but as they are not material to the consideration of the points raised they have been omitted. By the prayer, plaintiff, after asking for a temporary restraining order and a preliminary injunction, demands that defendants be required to set forth the nature of their respective claims; that defendants and each of them and all persons claiming under and through them be forever debarred, restrained and enjoined from entering upon the land and premises described in said complaint, and breaking the gates and dams of plaintiff's said reservoir and dam and drawing

off the water and using the same for mining purposes, and for such other and further relief as the court shall deem meet in the premises.

Appellants earnestly attack these pleadings upon the ground that no facts are stated sufficient to constitute a cause of action for injunction against trespass, for damages, or otherwise. It is argued that no facts are set forth to show irreparable injury or damage or waste or that plaintiff has no plain, speedy and adequate remedy at law. It must be conceded that as far as the allegations of irreparable injury are concerned that the allegations contained in the complaint are mere conclusions. To be sufficient, facts should be stated showing how and why injury would result. (*Randall* v. *Freed*, 154 Cal. 299 [97 Pac. 669]; *Willis* v. *Lauridson*, 161 Cal. 106 [118 Pac. 530].) Concerning the question of waste, we find a different situation. The complaint charges that defendants have entered the property contrary to the terms of the lease, have broken the gate and used the water and threaten by forceful means to continue to do so unless restrained. Appellants insist that as the evidence shows that respondent did not own the water rights such allegations cannot be considered.

It must be remembered that while the evidence and the whole record may be considered for the purpose of determining whether error, if any, is prejudicial, the evidence plays no part in determining the correctness of a ruling on a demurrer. At the time of such a ruling the trial court does not have the evidence before it and its ruling is based solely upon the facts as alleged in the pleading and for the purposes of the demurrer these facts are assumed to be true. The complaint showed on its face that plaintiff owned the dam and reservoir; that water was being taken from them forcibly by the defendants and that they would continue to do so unless restrained and that plaintiff would not only be deprived of the water but that the taking thereof would ripen into an adverse right. It is well settled that water for irrigation, while in ditches and reservoirs, is generally considered as real property and appurtenant to the land. (*Relovich* v. *Stuart*, 211 Cal. 422 [295 Pac. 819]; *Fawkes* v. *Reynolds*, 190 Cal. 204 [211 Pac. 449]; *Copeland* v. *Fairview Land & Water Co.*, 165 Cal. 148 [131 Pac. 119]; *Stanislaus Water Co.* v. *Bachman*, 152 Cal. 716, 725 [93 Pac. 858, 15 L. R. A. (N. S.) 359].) At

the time of the ruling on the demurrer and in the light of the allegations of the complaint the trial court had a right to assume that the water contained in the reservoir and which was being wrongfully used was real property appurtenant to the reservoir, subject, of course, to disposition under the lease. In 14 California Jurisprudence, page 221, section 34, it is said:

"An injunction will lie to prevent a wrongful act if the continuance of such act will, in time, ripen into an easement in favor of the defendant which will operate to deprive the plaintiff of the use of his property or some part thereof, or where it takes from him the substance of his estate, whether or not the immediate damage inflicted by the act is appreciable." (Cited in support of this are a number of water cases, including *Pabst* v. *Fimmand,* 190 Cal. 124 [211 Pac. 11].)

The general demurrer was properly overruled. At all times since the commencement of this action and during this appeal respondent has taken the position that the action is one to quiet title and that so considered it states a cause of action. Appellants complain that there are no appropriate allegations showing that they are asserting some claim to the property hostile to the plaintiff's title or that such claim is without right and is unfounded. Without taking time to discuss these points or the questions raised by the ruling on the special demurrer, and assuming, for the sake of argument, that the complaint did not state a cause of action for injunctive relief against a trespass, we are, nevertheless, of the opinion that appellants are in no position to rely upon any error that might have occurred because of the order overruling their demurrer. By their answer appellants set up a claim to a prescriptive right to use the dam and reservoir. The complaint and answer taken together then presented clearly all the issues necessary to an action to quiet title. When the trial opened, the court stated that inasmuch as the title of the plaintiff was admitted by the pleadings the burden of showing a prescriptive right rested upon the defendants. The defendants thereupon offered evidence in support of their claims. The case was tried upon this theory and appellants have made no attempt whatever to show this court that they were prejudiced in any way by the rulings on the demurrer. Section 4½ of article VI of the Constitution was adopted to meet just such situations as this. Speaking of it, the Su-

preme Court has said in the case of *Etienne* v. *Kendall,* 202 Cal. 251 [259 Pac. 752] :

"Under the terms of this section when the attack upon the judgment is based upon an error in the pleadings it is incumbent upon the appellant to demonstrate before the appellate court that the error complained of has resulted in a miscarriage of justice. But even in such a case the appellate court may not reverse the judgment except upon an examination of the entire cause, including the evidence. Where, therefore, upon an examination of the evidence the appellate court is satisfied that the error complained of has not resulted in a miscarriage of justice, but that in fact it has not affected the substantial rights of the appellant in any particular it would be a distinct violation of this section of the Constitution to reverse the judgment solely upon the ground of the error occurring in the pleadings." (See, also, *Langstaff* v. *Mitchell,* 119 Cal. App. 407 [6 Pac. (2d) 546].)

The record before us shows that whatever defects may have existed in the complaint, the missing or deficient allegations were supplied by the answer and that the trial was conducted with no more harmful results to appellants than if these issues had been tendered by the complaint. We are satisfied that no miscarriage of justice has resulted and that the rulings have resulted in no prejudice to any substantial rights of any appellant.

It is next contended that the court erred in finding that the allegations of paragraphs V, VI and VII of the first count and paragraphs II, III, IV, V, VI, and VII of the second count were true. The last-mentioned paragraph alleged the incorporation of the corporate defendant and was admitted by a failure to deny it. It will be noted that the other paragraphs, as shown above, all relate to acts of damage or waste. The judgment made no provision for the recovery of damages. If contrary findings had been made the judgment would have been the same. Therefore, appellants have not been prejudiced by said findings and cannot complain thereof.

By finding IV, relating to the second count, the court found *"that plaintiff is the owner and entitled to the water stored in said reservoir and in said dam"*. By finding V, relating to the second count, it was found "that defendants have no right, title, estate, interest or claim in or to said dam and

reservoir, or in any part thereof; *that the defendants have no right, title, interest or estate in or to the use or ownership of the water accumulated or stored in said reservoir and dam"*.

Appellants contend that the italicized portions of said findings are erroneous and prejudicial to their rights. They argue that if they ever attempt to litigate the water rights used in connection with the whole system these findings will be used against them to show a binding adjudication of such rights. We are not impressed with this argument as it clearly appears that the water mentioned in the findings is the water that was in storage in the reservoir. A water right is to be distinguished from the water itself and from the right to use a ditch, dam or reservoir as a conduit or place of storage for it. Here the findings clearly involve the title to the water in storage—the *corpus* of the water; not the usufructuary right. These findings were made in connection with the second cause of action and do not relate to the rights of Moulton, Clerkin and Harris as members of the association; they relate only to the rights of the remaining defendants, who were not members, and, as we have pointed out, concern only the water in storage. By their answer these defendants claimed ownership of the water in storage and thus raised the issue. At the trial, however—if we interpret the record correctly—this issue was eliminated by repeated statements of counsel on both sides that no question concerning the water was involved. It is therefore ordered that the italicized portions of said findings be stricken out. It may be added, parenthetically, that inasmuch as practically a year and a half has elapsed since this case was instituted, the water mentioned in said findings was probably used for domestic and irrigation purposes many months ago and the question raised is now probably moot. However, we cannot be sure of this and do not rest our decision on that ground.

It is next contended that the court failed to find on material issues presented. By paragraph III of count I of the complaint it was alleged that certain persons, including the appellants Moulton, Clerkin and Harris, "went into possession and have since held possession of said reservoir under the permission granted in said lease as aforesaid". It is true there was no express finding on this point but there were implied findings directly to the contrary.

 In their answer appellants alleged that ''said lease was never assigned to the said San Juan Ridge Water Users Association and that said Association disbanded and ceased to function in the year 1929 and never acted and/or functioned as an association thereafter''. It is now complained that no findings were made on the issues thus presented. We have heretofore pointed out that the other findings do not rest upon a formal assignment, but upon other grounds. Hence, a finding upon this issue is not material, nor can we see how the failure to find on the issue of disbandment could have harmed appellants in any way. If the association was disbanded, it simply went to the weight of the evidence adduced to show whether or not appellants' possession was hostile or permissive. The evidence on the point was conflicting, and even if the court had found that the old association was disbanded in 1929 and ceased to function thereafter, there was still evidence to support the court's findings against the claim of prescriptive right. Moreover, if there was such a disbandment, there was no evidence, so far as we are advised, that this fact was brought to the attention of the lessors or their successors before November, 1931, or later.

 Directing their attack against the judgment, appellants contend that it improperly contains provision for injunctive relief. However, as we have held that the action, as framed and tried, was to quiet title, this provision was proper. That such relief is proper in an action to quiet title is too well settled to require citation of authority.

Finally, appellants complain that the judgment goes far beyond the issues raised or the facts found, and we are of the opinion that this complaint is justified as far as the defendants Moulton, Clerkin and Harris are concerned. As it now stands, the judgment quiets respondent's title and enjoins said defendants from using the dam and reservoir for any purpose whatsoever. But in its first cause of action, against these defendants, respondents recognized their rights, as members of the old association, to use said property for domestic and irrigation purposes. As to them, the action was limited to questions arising out of mining uses only and the judgment should, therefore, be limited to the same questions.

The cause is remanded to the trial court and that court is directed to modify the judgment so as to limit its provisions, to the extent that they relate to defendants Moulton, Clerkin

and Harris, to the use of said facilities for mining purposes. As so modified, the judgment is affirmed. Respondent to recover its costs on appeal.

Thompson, J., and Pullen, P. J., concurred.