[Civ. No. 20959.   Second Dist., Div. One.   Oct. 31, 1955.]

HAROLD LLOYD, Appellant, v. CALIFORNIA PICTURES CORPORATION (a Corporation) et al., Defendants; R.K.O. PICTURES, INC. (a Corporation), Respondent.

Fendler & Lerner, Harold A. Fendler and Robert Haves for Appellant.

Mitchell, Silberberg & Knupp and George Benedict, Jr., for Respondent.

DORAN, J.—On September 10, 1945, a contract was entered into between the Lloyd Corporation, plaintiff's assignor, and the defendant California Pictures, for the services of Harold Lloyd in a photoplay later known as "Mad Wednesday." On the same day, in connection therewith, Harold Lloyd contracted with Lloyd Corporation to furnish to California Pictures "artistic and stellar services," the agreement provided that plaintiff must "receive star billing and screen credit, advertising credit, and publicity credit as star" of the photoplay.

According to plaintiff's complaint, California Pictures agreed with Lloyd Corporation to be bound by the contractual undertakings of the Lloyd Corporation to Harold Lloyd, and expressly agreed to "give and guarantee the giving, directly and personally to the plaintiff, Harold Lloyd, of star billing and screen credit, advertising credit, publicity credit, and exploitation credit as the star" of the photoplay. These obligations were made binding on California's successors, assigns, licensees, distributors and exhibitors. Plaintiff Harold

Lloyd guaranteed performance by Lloyd Corporation, agreed to complete the picture and gave California the right to use plaintiff's name, likeness and voice in connection with the photoplay.

It is further alleged that in return for such guarantee and undertaking, California Pictures agreed on behalf of its successors or assigns, that it would "mention the name of Harold Lloyd as star on the positive prints of, and in all paid advertising and publicity thereafter issued in connection with the production or distribution of said motion picture photoplay." It is alleged that plaintiff, and plaintiff's assignor, Lloyd Corporation, fully performed all obligations under the contracts.

The complaint avers that California released the film in 1947 through United Artists, at which time all contractual obligations were complied with by California. However, the film was withdrawn from release prior to December 1, 1947, and was not again publicly shown until October 10, 1950, after respondent RKO Radio Pictures took over distribution of the picture. It is alleged that about December 13, 1947, California Pictures entered into a written security contract with the defendant Hughes Tool Company which agreed to pay certain debts of California; that as a part of such agreement California assigned the photoplay "Mad Wednesday" to Hughes as security, with rights of distribution, "subject to the duties and obligations of said rights and contracts assigned as aforesaid."

The complaint, as amended, alleges that on November 10, 1950, defendants Hughes and R.K.O. "confirmed by letter agreement in writing a previous and pre-existing oral agreement entered into prior to October 11, 1950, wherein and whereby Hughes granted to R.K.O." world-wide distribution rights to the photoplay, "upon substantially the same terms and conditions as those contained in the distribution agreement dated December 19, 1944, previously entered into between California and United Artists Corporation."

As stated in respondent's brief, "In respect to many matters, including screen credits, advertising and publicity . . . RKO agreed to follow 'the wishes and instructions' of Hughes." RKO is alleged to have had knowledge of the California-Lloyd contract and Hughes' assumption thereof; in reference to "Mad Wednesday," the defendants RKO, Hughes and California are alleged to have "jointly participated in or authorized or concurred in or ratified each and every action taken, and things done."

It is also to be noted that Howard Hughes is alleged to be the sole stockholder in California Pictures, as well as being a majority stockholder, president and director of the defendant Hughes Tool Company, and controlling stockholder, director of and in control of the defendant RKO, "particularly with respect to the distribution, exploitation, publicity and advertising of the photoplay 'MAD WEDNESDAY.'"

There are allegations that about October 11, 1950, plaintiff and the Lloyd Corporation notified defendants that objection would be made to any departure from the original contracts "with respect to the advertising and publicity credit to be given Harold Lloyd as the star." Defendant RKO replied by letter on October 18, 1950, that RKO had received "full notice, advice and knowledge" of the provisions in question, and that RKO "had complied and would continue to comply with, and to faithfully keep and perform the terms and provisions of said contract," and that all advertising and publicity would be in accordance with the original contract, which acknowledgments and assurances were made by RKO "for the purpose of inducing plaintiff and plaintiff's assignor to forego and forebear" the commencement of legal or equitable proceedings, which representations were relied upon. In this connection it is claimed that the defendant RKO is therefore "estopped to deny that it is bound by said provisions."

The defendants, and each of them, are alleged to have "impaired, and diminished the value of the name and reputation of the plaintiff, Harold Lloyd, in the motion picture industry and in the mind of the general public . . . by subordinating or eliminating the name . . . from advertising and publicity issued and caused to be issued . . . and in such a manner as to conceal from the entertainment industry and from the general public throughout the world that the plaintiff, Harold Lloyd, was the 'star' of and in said motion picture photoplay," to plaintiff's damage in the sum of $250,000.

Defendants demurred generally and specially to the complaint; the trial court deferred submission of the demurrer pending the filing of amendments by plaintiff, and thereafter sustained the demurrer of RKO without leave to amend. The case is at issue in respect to the other two defendants, and RKO is the only respondent on this appeal.

Four theories are presented by appellant on which recovery

might be had, namely, (I) "Respondent, having acquired only the right and license to distribute the photoplay, is bound by notice and knowledge to the obligations of billing and credit connected with the use of plaintiff's name, likeness and voice"; (II) "Respondent was contractually bound, under the rules of promissory estoppel, to give plaintiff star billing"; (III) "Respondent has assumed the obligation to give plaintiff star billing in all paid advertising and publicity," and is liable for having failed to do so; and (IV) "Respondent, having directly caused a breach of contract, is liable."

It is the respondent's contention that RKO, not being a party to the original Lloyd-California contract, and never having assumed liability thereunder, was under no duty to perform the obligations thereof; that the complaint states no cause of action either on the theory of promissory estoppel, or otherwise; that the complaint shows on its face that it is incapable of amendment, and therefore there was no abuse of discretion in sustaining the demurrer without leave to amend.

As hereinbefore indicated, the merits of plaintiff's complaint, and likewise the merits of any defense offered by the defendants, are matters in no manner involved in the present appeal. ■■■ According to the long established rule, as stated in *Roberts* v. *Wachter,* 104 Cal.App.2d 281 [231 P.2d 540], and elsewhere, "On appeal from a judgment sustaining a demurrer to a complaint the allegations of the complaint must be regarded as true. . . . All that is necessary as against a general demurrer is to plead facts entitling the plaintiff to some relief." The reviewing court in such an appeal "is confined to the allegations of the complaint," and as said in *San Juan Gold Co.* v. *San Juan Ridge Mut. Water Assn.,* 34 Cal.App.2d 159, 174 [93 P.2d 582] : "the evidence plays no part in determining the corectness of a ruling on a demurrer."

It is appellant's contention that the ruling in the instant case, sustaining the demurrer without leave to amend, resulting in a dismissal as to the respondent RKO, determines as a matter of law, issues of fact which should only be decided after a plenary hearing on the merits. The case is at issue as to the other defendants. If this dismissal as to RKO be sustained, appellant points out that "the other two defendants will be perfectly free to claim that RKO is the wrongdoer and that they endeavored mightily to obtain performance by RKO."

Perfection in pleading is no more expected or required than in other realms of endeavor. As said in *Kauffman* v. *Bobo & Wood*, 99 Cal.App.2d 322, 323 [221 P.2d 750], "It is well established that a general demurrer must be overruled if, on any theory, it states a cause of action." The same case points out that "pleadings and amendments thereto should be allowed and construed liberally with the object of affording every litigant his day in court and to render substantial justice between the parties." And "Generally, it is held to be an abuse of discretion to sustain without leave to amend a demurrer to an original complaint unless the complaint shows on its face that it is incapable of amendment." (*Temescal Water Co.* v. *Department of Public Works*, 44 Cal.2d 90 [280 P.2d 1].)

An application of the rule of liberal construction leads to the conclusion that plaintiff's amended complaint sufficiently states a cause of action on one or more of several theories. The sustaining of defendant RKO's demurrer without leave to amend was therefore reversible error. As before indicated, whether the plaintiff will be able to prove the allegations made, is entirely immaterial on the present appeal since against a demurrer the allegations of the complaint must be taken as true.

As is often the case, plaintiff in the present litigation is confronted with the activities of several different defendants, and at a trial on the merits might recover judgment against one or more defendants, or against none. In a case such as the present, where it appears from the complaint that all three defendants were in some manner involved in causing the alleged loss, plaintiff should be accorded the opportunity to confront all of such defendants in court and present the case in its entirety. This course of procedure would not only benefit the plaintiff but would be of inestimable aid in enabling the trial court to view the entire picture and to thus arrive at the correct result.

To require RKO to go to trial along with the other two defendants seems particularly fitting in view of plaintiff's allegations as to the interlocking nature of the three corporate defendants, in all of which Howard Hughes is alleged to be a majority or controlling stockholder. Proof of this relation between the three defendants might conceivably be of importance in reference to plaintiff's theory of promissory estoppel. RKO is likewise charged with having induced a breach of contract by the other defendants. The knowledge and conduct of RKO, as alleged by plaintiff, forms an integral part of

the general picture. To limit plaintiff's litigation to a two-thirds survey of the situation by dismissing the case against RKO without trial, would, under the peculiar circumstances here present, deprive the plaintiff of substantial rights.

No case has been cited by either party dealing with either an identical or parallel situation. Indeed the fundamental law of the case seems to be reasonably well settled; its final application to the facts of this case should be left to the trial court or jury at a hearing on the merits, participated in by all defendants. Nor is it necessary to now determine which, if any, of plaintiff's theories may bear fruit. If however, plaintiff is able to prove the facts alleged, recovery on one or more of such theories would follow.

Promissory estoppel, one of the theories relied upon in the plaintiff's complaint, is expounded in the Restatement of Contracts, section 90 (1932), as follows: "A promise which the promissor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

The courts of this state have adopted this doctrine, as evidenced by the opinion in *Edmonds* v. *County of Los Angeles*, 40 Cal.2d 642, 653 [255 P.2d 772] : "By their conduct they led everyone to believe that the exception had been granted. Plaintiffs made an oral promise on which defendants relied to their detriment, and justice can be done only by the enforcement of the promise. The situation presented is therefore the ordinary one of promissory estoppel."

Plaintiff's amended complant has pleaded facts from which such an estoppel could arise. RKO is alleged to have given assurance to plaintiff that the terms of the Lloyd-California contract would be complied with, which assurance is claimed to have been relied upon to plaintiff's detriment. Whether plaintiff's forbearance to sue was or was not requested by RKO, would appear to be immaterial. It is unnecessary to enter into a detailed discussion of the various theories presented in the complaint. As against the demurrer, the complaint is sufficient.

The judgment is reversed with instructions to overrule the demurrer, and allow a reasonable time for respondent RKO to file an answer.

White, P. J., and Drapeau, J., concurred.