[Civ. No. 4970. Third Appellate District.—December 13, 1933.]

BANK OF AMERICA NATIONAL TRUST & SAVINGS ASSOCIATION, Appellant, v. BANK OF AMADOR COUNTY (a Corporation), Respondent.

Louttit, Marceau & Louttit for Appellant.

Case & Forslund for Respondent.

PLUMMER, J.—This action involves the question of whether the beneficiary of the deed of trust conveying real property, together with the rents, issues and profits thereof, or the holder of a subsequent crop mortgage, mortgaging the crop thereon, is entitled to the proceeds of a growing crop. Also, error of the court in admitting evidence. The defendant holding the trust deed had judgment, and from this judgment the plaintiff appeals.

The transcript shows that on or about the seventh day of August, 1930, Richard Raggio and Clayton Raggio executed a deed of trust to the respondent, the trust deed conveying

to trustees for the benefit of the respondent, certain real property owned by the Raggios, together with the rents, issues and profits thereof, and provided, among other things, that in case of default the trustees named in the deed of trust, either personally or by receiver, might enter upon and take possession of the property, and collect the rents, issues and profits thereof.

On the third day of October, 1931, the Raggios executed to the appellant, as security for the payment of a promissory note, a crop mortgage mortgaging to said appellant all crops growing, or that might be growing during the years 1931–1933, inclusive. This mortgage covers all kinds of crops that might be planted, or that were growing upon the premises described therein, being the same premises described in the trust deed. The trust deed and mortgage were both duly recorded.

Subsequent to the execution of the crop mortgage the Raggios, without having obtained consent of the appellant, sold certain alfalfa growing upon the mortgaged premises for the sum of $500. The check representing the receipt for the sale of the alfalfa was turned over to Mr. Case, the attorney for the respondent. On the part of the respondent it was alleged that the Raggios defaulted in the payment of their obligations, and that thereupon Mr. Culbert, one of the trustees named in the deed of trust, took possession of the premises and claimed the rents, issues and profits thereof, etc. The claim of the defense is further that this possession was taken prior to the execution of the crop mortgage.

. The claim of possession is based upon the following testimony, all of which was admitted, under objection, as being hearsay, incompetent, immaterial and not sufficient to establish the fact of possession, to wit: Mr. Culbert, for the respondent, testified as follows: "Q. (By Mr. Case): I will ask you what you did in September, 1931, with regard to taking possession? A. I went to the ranch, and after a conversation with Raggio, advised him that I, as trustee of the Bank of Amador County, then and there take and claim possession of the Raggio ranch; and from there I went to Stockton, and so advised you (referring to Mr. Case). Q. What was that conversation? (Referring to a conversation had with Mr. Case in Stockton.) A. Well, with reference to interest and taxes and the reclamation district taxes.

Q. State what was said? A. He (referring to Raggio) said he was unable to pay anything, unable to pay anything. Q. What did he say with reference to his ability to occupy and run the ranch? A. Well, he said he would like to stay there and see what he could get out of it. I said, 'All right, you can stay there, but it is our ranch now.' Q. What did you direct your attorney to do? A. I directed you to proceed as soon as possible to foreclose and take it over. Q. And what with reference to operating the ranch and financing it? A. I instructed you to pay such bills as were necessary for the handling of the ranch, and sent you a check-book for that purpose immediately on arriving home, which was the next day. Cross-examination by Mr. Marceau: Q. After you were there in September, Mr. Raggio continued to live there? A. Yes, Clayton stayed there. Q. And he did the work on the ranch? A. Well, he did some work; I hired others there to do some work, a lot of things. Q. The men that you hired were men that had been working for him before? A. I don't know. Q. You just told Mr. Raggio to do certain things, and you had Mr. Raggio do the employing of these men? A. Yes, Raggio looked after these things for me. Q. And you never personally moved on the ranch? A. No, thank God, no. Q. And no officer of the bank? A. No.''

Mr. Case, called as a witness for the respondent, testified as follows: ''Q. Did you have a conversation with Mr. Culbert about the middle of September, 1931, with reference to the Raggio loan and the Raggio ranch? A. I did. Q. Where was that conversation held? A. In my office in Stockton. Q. Who were present? A. Mr. Culbert and myself. Q. What was that conversation? A. Mr. Culbert told me he had been to the Raggio ranch and made an examination, and in view of the fact that Mr. Raggio was unable to pay the taxes and operate the ranch, he had taken possession, and wished me to represent him in all matters relative to the operation of the ranch. He told me to purchase livestock from the Bank of America and purchase some feed and operate the ranch, and to take all payments of any kind, and when the proper time came, to arrange for the planting of the ranch crops, and that he would be constantly in communication with me and advise what he wanted me to do in the matter. He also told me to pro-

ceed to foreclose the deed of trust and cause the property to be sold under the trust deed. He further stated that he would give me a check-book, and place the money in my name in the Bank of Amador County, as agent, and that I was to pay all operating bills and proceed to operate the ranch. Q. What did you do with respect to these instructions? A. When Mr. Culbert sent me the check-book, I proceeded to pay all labor used on the ranch, and I purchased the horses and the hay and other chattels from the Bank of America and paid for them with checks. Mr. Raggio came to my office frequently, and I instructed him what to do. He did nothing about hiring men without consulting me. He would state to me what men he hired, what they did during said employment. I also went to the ranch frequently and examined the ranch and what was being done. And I paid all the bills for operating the ranch.''

Mr. Culbert also testified as follows, regarding the growing alfalfa which was sold for feed, to a man by the name of Saunders, with reference to a conversation had with Raggio: ''A. Yes, he spoke to me of feed conditions there, and said he might be able to sell it to a sheepman. I said, 'All right; look around and see if you can find a sheepman that will buy it; find out what he will give and then let me know.' A few days later he advised me when I was in Stockton, how he had contacted a man by the name of Saunders, and that Saunders would give him $500.00 for the feed, and he thought it was a pretty good price. I said, 'Go and get that $500.00 as soon as you can, and you bring it to me or to Mr. Case.' ''

All of the questions asked of the witness Culbert relative to conversations between him and Raggio, and also relative to conversations with Mr. Case, and likewise, all of the testimony of Mr. Case as to conversations between him and the witness Culbert and Mr. Raggio, were objected to on the ground of irrelevancy, incompetency, immateriality and hearsay; that the questions called for self-serving declarations; that defendant, by permitting Raggio to remain in possession of the ranch as the ostensible owner, was estopped from claiming that Raggio held possession merely as an agent of the defendant; that nearly all of the questions called for, and the answers given, related to conversations between Mr. Culbert and his attorney, or conversations had

between Mr. Culbert and Mr. Case on the one· hand, and Mr. Raggio on the other, elicited and constituted only hearsay testimony. The conversations between Mr. Culbert and Mr. Case in the city of Stockton as to what Mr. Culbert told Mr. Case, and also what he told Mr. Case to do, were immaterial and irrelevant, as showing acts constituting possession; likewise, what Mr. Culbert said to Mr. Raggio, that he took possession for the bank, did not show any actual possession, but only what he, Culbert, said to Mr. Raggio. It does show that by the trustee's own declaration he left Mr. Raggio in possession of the premises. Neither Mr. Culbert, as trustee, nor any officer of the bank, went upon the mortgaged premises and remained in possession thereof.

In order to effect a change of possession there must be something more than mere words, and also something more than the mere paying of bills, when a trustor or mortgagor is left in possession of the mortgaged premises, in order to constitute a possession sufficient to give notice to creditors or third parties who may have dealings with the trustor or mortgagor.

In order to constitute a mortgagee or trustee in possession there must be something more than a mere paper title. There must be an actual open, visible possession.

As shown by the cases hereinafter cited, the law is well settled in this state that a deed of trust, though differing in form from a mortgage, is essentially a security, and therefore, one claiming as a trustee in possession must have performed such physical acts as would be required to constitute a mortgagee in possession in order to bar the rights of subsequent creditors.

In 41 C. J., page 612, the term "mortgagee in possession" is thus defined: "The term 'mortgagee in possession' is applied to one who has lawfully acquired actual possession of the premises mortgaged to him, standing upon his rights as mortgagee, and not claiming under another title, for the purpose of enforcing his security upon such property, or making its income pay his debts; but the fact that the mortgagee receives the rents and profits does not constitute him a mortgagee in possession unless he takes the rent in such a way as to take out of the hands of the mortgagor the management and control of the estate."

In 49 C. J., page 1094, we find the definition of "possession of land" which we think applicable to the instant case, to wit: " 'Possession of land' has been defined as the actual control, by physical occupation; the holding of it, and the exercise of dominion over it; the immediate, exclusive dominion of it; that position or relation which gives to one its use and control and excludes all others from a like use or control. Thus it appears that there may be different modes of acquiring and holding possession of land; and what constitutes possession in a given instance, is sometimes difficult to determine, owing to the existence of qualifying circumstances." In the instant case conversations between the witnesses Culbert and Case, and what Mr. Culbert may have stated to Raggio do not constitute qualifying circumstances.

The acts performed and the dominion exercised by a mortgagee, to constitute possession, we think are akin to the acts performed and dominion exercised, to constitute what, in law, would be adverse possession, save and except as to payment of taxes now required by statute.

In the case of *Steele* v. *Benham,* 84 N. Y. 634, where the question of whether a mortgagee was in possession, such as to notify creditors was involved, we find the following: "To satisfy the statute the possession must be actual, not merely constructive or legal. In *Topping* v. *Lynch,* 2 Rob. (25 N. Y. Super. Ct.) 484, it was said that the words 'actual and continued change of possession' in this statute 'mean an open public change of possession, which is to continue and be manifested continually by outward and visible signs, such as render it evident that the possession of the judgment debtor has ceased'. In *Crandall* v. *Brown,* 18 Hun (N. Y.), 461, it was said that 'constructive possession cannot be taken under a chattel mortgage'; that 'possession must be taken in fact', and that 'possession cannot be taken by words and inspection'."

In *Hart* v. *All Persons,* 26 Cal. App. 664 [149 Pac. 236], this court, dealing with the question of actual possession, quoted with approval the following language: "In *Lofstad* v. *Murasky,* 152 Cal. 64 [91 Pac. 1008], the court quoted approvingly from *Wolf* v. *Baldwin,* 19 Cal. 313, in stating what kind of actual occupation was required under the Van Ness ordinance and as applicable under the McEnerney Act, as follows: 'A possession which is accompanied with

the real and effectual enjoyment of the property. It is the possession which follows the subjection of the property to the will and dominion of the claimant to the·exclusion of others; and this possession must be evidenced by occupation, cultivation, or other appropriate use, according to the locality and character of the particular premises. . . . It must, in other words, be an open, unequivocal, actual possession— notorious, apparent, uninterrupted, and exclusive—carrying with it marks and evidences of ownership, which apply in ordinary cases to the possession of real property.' . . . 'A mere intention to occupy land, however openly proclaimed, is not possession. The intention must be carried into actual execution by such open, unequivocal, and notorious acts of dominion as plainly indicate to the public that the person who performs them has appropriated the land and claims exclusive dominion over it. Anything short of this is not what the law denominates possession.' ''

To the same effect is the decision of this court in the case of *Mattes* v. *Hall,* 21 Cal. App. 552 [132 Pac. 295].

In *Casey* v. *Doherty,* 116 Cal. App. 42 [2 Pac. (2d) 495], the rule is stated, supported by authorities cited, that ''a mortgagee not in possession is not entitled to the rents, issues and profits of the premises where the mortgagor has remained in possession of the premises''. The fact that the rents, issues and profits of the mortgaged property are expressly pledged for the security of the mortgaged debt, with the right in the mortgagee to take possession upon default, does not entitle the mortgagee to the rents and profits until he takes actual possession or until actual possession is taken in his behalf by a receiver. (*Simpson* v. *Ferguson,* 112 Cal. 180 [40 Pac. 104, 44 Pac. 484, 53 Am. St. Rep. 201].) Thus, the fact that in the instant case the trust deed purported to include the rents, issues and profits as security would not avail, unless the trustees were in actual possession at the time of the execution of the chattel mortgage belonging to the plaintiff.

In the case of *First Nat. Bank of Lindsay* v. *Garner,* 91 Cal. App. 176 [266 Pac. 849], this court went into the question very thoroughly as to the respective rights between a mortgagee whose mortgage included in its provisions, rents, issues and profits, as against a third person claiming under a chattel mortgage ˙covering the crops grown upon the

mortgaged premises, and it was there held that until the mortgage had been foreclosed, the mortgagor in possession was entitled to the rents, issues and profits of the mortgaged premises, and of course possessed the right to mortgage the same.

Under section 2927 of the Civil Code a mortgagor is entitled to possession unless otherwise provided for in the mortgage, and under section 707 of the Code of Civil Procedure the title to the rents, issues and profits does not pass from the owner of the premises until the date of sale, and therefore a chattel mortgage on crops, executed prior to the date of sale, would be valid.

In *Nelson* v. *Bowen*, 124 Cal. App. 662 [12 Pac. (2d) 1083], this court had occasion to go into the question of possession as between one holding under a trust deed and the claim of one based upon a chattel mortgage executed after the date of taking possession. The trial court found the following facts which this court held to be sufficient to show actual possession under the trust deed, to wit: "The Insurance Company (assignee under the trust deed) on or about the 19th day of April, 1927, lawfully took possession of the real property and all its appurtenances, including, as well, the growing crops thereon, and that upon said date the Orchard Company peaceably surrendered possession thereof to respondent Insurance Company; that the Insurance Company thereafter plowed, cultivated, sulphured, cared for and harvested and marketed all the crops growing on said premises, and paid all the expenses thereof; that the occupancy of the Insurance Company was open, notorious, etc.; that on and after the nineteenth day of April, 1927, the Orchard Company exercised no control whatever over said property, or over the growing crops thereon, and did not in any manner care for, harvest or market any of the growing crops; that on the twenty-sixth day of May, 1927, the Orchard Company, its agents, officers and employees, removed from said real property and wholly abandoned the same, and thereafter, and at all times mentioned herein abandoned said property and surrendered the possession thereof to the Insurance Company; that thereafter the Insurance Company at all times continued to hold the possession of said property, and of the crops growing thereon; that the crops

on said property consisted of prunes, peaches, grapes, and other fruits,'' etc.

This court further quoted from 41 C. J., page 612, as to what constitutes a mortgagee in possession. As to what constitutes a mortgagee in possession, and the rights and liabilities pertaining to such relation, we cite further from 17 California Jurisprudence, page 1016, which supports what we have heretofore stated, and the cases cited.

That a trust deed executed for the purposes of security is in substance no different from a mortgage, save and except the power of sale is vested in the trustees, is established by the following cases: In *MacLeod* v. *Moran*, 153 Cal. 97 [94 Pac. 604], the Supreme Court said: ''The nature of such an instrument has been extensively discussed by this court, and the sum and substance of such discussion is that while all legal title passes thereunder, and the trustees cannot be held to hold a mere lien on the property, it is practically and substantially only a mortgage, with power of sale.'' (Citing authorities.)

In *Wasco Creamery & Construction Co.* v. *Coffee*, 117 Cal. App. 298 [3 Pac. (2d) 588], the cases are cited supporting and following the rule announced in *MacLeod* v. *Moran*, *supra*.

This court, in the case of *Bank of Italy National Trust & Savings Assn.* v. *Bentley*, (Cal. App.) 4 Pac. (2d) 546, went into the nature and characterization of trust deeds, citing authorities to the effect that a trust deed, when given as security, is nothing more than a mortgage, with power of sale. While a hearing was granted by the Supreme Court in this case, the decision of the Supreme Court reported in 217 Cal. 644 [20 Pac. (2d) 940], follows the same line of reasoning, to the effect that a trust deed with power of sale is in substance only a different form of security when given for the purpose of securing the repayment of money.

█ The record in this case shows beyond controversy that Clayton Raggio continued to occupy the premises included in the trust deed and covered by the chattel mortgage, managed and controlled the same, sold the crop, and collected the money. It further appears from the record and the testimony which we have set forth that there was no apparent change of possession. Nothing was done which would give notice to third parties. The men who were em-

ployed to work upon the premises were hired by Clayton Raggio. The fact that their wages were paid by the respondent is not of itself any evidence of a change of possession.

Without discussing further the inadmissibility of the testimony it is sufficient to state that the finding of the court as to the change of possession is not supported by the testimony. The indebtedness of the Raggios to the plaintiff and the execution of the chattel mortgage are admitted.

It follows from what we have said that the judgment of the trial court should be reversed, and it is so ordered.

Thompson, J., and Pullen, P. J., concurred.