[Civ. No. 14000. Second Dist., Div. Three. Jan. 31, 1944.]

SECURITY-FIRST NATIONAL BANK OF LOS ANGELES (a National Banking Association), as Trustee, etc., Appellant, v. GARY COOPER et al., Defendants; LEON ALEXANDER et al., Respondents.

Warren E. Libby for Appellant.

Dana R. Weller for Respondents.

SHAW, J. pro tem. — The plaintiff brought this action against Santa Monica Lodge No. 906, Benevolent and Protective Order of Elks, an unincorporated association, and 1188 persons alleged to be members of it, of whom 188 were designated by their true names and 1000 by names alleged to be fictitious. Two corporations were also made defendants, one being an incorporation of the lodge, and the other, Santa Monica Elks Home, Inc., being a corporation which owned property formerly occupied by the lodge. Plaintiff sought to recover from both the incorporated and the unincorporated lodges and from the individual members of the latter sums of money due from the unincorporated lodge to the corporation, Santa Monica Elks Home, Inc., under a lease of certain real property made by the corporation to that lodge and alleged to have been assigned to plaintiff. At a trial at which a number of the individual defendants were represented, a nonsuit was granted. Plaintiff appeals.

The array of facts leading up to this litigation begins about July 1, 1926. Just before that date the Santa Monica Lodge of Elks was an unincorporated association of about 2200 members and occupied for lodge purposes a building herein referred to as the "old building." Desiring to have a newer building, this lodge caused to be organized the above mentioned corporation, Santa Monica Elks Home, Inc., and this corporation, in some manner not appearing in the record, acquired the real property on which the old building stood and another parcel of real property on which the new building was later built. On or about July 1, 1926, this corporation issued bonds in the sum of $400,000, and to secure their payment executed a mortgage with power of sale of both parcels of real property above mentioned to a bank which, by a series of consolidations, has become merged into the

plaintiff. This mortgage might well be called a trust deed, for it contains words of conveyance, as well as words of hypothecation, and the parties, in the instruments discussed below, referred to it as a "trust indenture," and to the bank as a "trustee." At the same time the lodge entered into a lease by which it leased all of said real property from the corporation above mentioned for a term of 30 years, agreed to pay as rent an amount equivalent to the operating costs and repairs of the real property and of all buildings upon it and (beginning July 1, 1941) a yearly rental of $40,000 per year in equal monthly installments, agreed to pay taxes and various other charges against the property, and "as further consideration for the leasing of the property aforesaid" the lessee agreed to pay all interest on the bonds above mentioned, (referring to the "trust indenture") to the trustee bank "or such other person as is designated by the Lessor." "As additional consideration for the granting of this lease" the lessee further agreed to pay to the bank the amounts required by the trust indenture to be paid into a sinking fund, which payments were to begin January 1, 1930, and continue to July 1, 1940. The mortgage and the lease were both dated July 1, 1926, but the evidence leaves some doubt whether they were delivered, so as to become effective, before July 31, 1926. On the last mentioned date the lessor named in the lease, Santa Monica Elks Home, Inc., executed and delivered to the trustee bank an assignment "as further security" for the bond issue, of "all right, title and interest in and to" the lease. In this assignment it was agreed that the assignor "may collect all rents unless and until the undersigned [the assignor] has defaulted on any of the terms and conditions of said trust indenture, and the Trustee in its discretion as provided in such trust indenture, proceeds to collect the rents in the manner therein provided." The trust indenture provided that failure to pay the principal of any bond when due, or any interest within 30 days after it is due (as well as other acts or omissions) shall constitute a default, and upon the happening thereof the trustee in its discretion may (and upon conditions not shown to have existed here, shall) "enter into and upon and take possession of the trust estate [defined to mean the property mortgaged] and may exclude the Company [the lessor above named] and its agents and servants and all other persons or corporations, wholly therefrom, and may use, oper-

ate, manage and control the trust estate, and conduct the business of the Company to the best advantage of the holders of the bonds secured hereby'' and further that ''The Trustee in case of such entry . . . shall be entitled to collect, take and receive all tolls, earnings, income, rents, issues and profits of the trust estate.'' We find no other provision in the trust indenture for the collection of rents by the trustee.

With the proceeds of this bond issue a new building was erected on part of the real property above mentioned. This building was completed and the lodge occupied it in August, 1927. The unincorporated lodge continued to occupy the new building until July 16, 1930. At this date the lodge was incorporated and thereafter the incorporated lodge occupied the new building until August, 1933, and then it moved back into the old building. On receipt of notice of this abandonment of the new building, plaintiff declined to take possession of it or of any part of the leased premises. The first time plaintiff ever took possession of the premises was June 16, 1937, and before that time it collected no rent. In January, 1930, a payment of $2,000 was made under the terms of the lease, but since then none of the payments required by it have been made, and plaintiff sues to recover all that have since accrued. The action was begun on June 30, 1936.

The parties have discussed here only the propriety of the nonsuit granted at the trial. However, plaintiff has given notice of appeal from ''those certain orders and judgments made in the above-entitled cause in favor of defendants and against plaintiff in the above entitled cause.'' The record presents to us a number of judgments and orders dismissing the action as to some individual defendants, made before the trial on the supposed authority of code sections penalizing failure to prosecute. The notice of appeal is adequate to cover all of these orders and judgments. It was filed September 5, 1941. ■ Some of the orders and judgments just referred to were made more than 60 days before that date, and as to them the appeal is too late and must be dismissed. ■ Another was made on plaintiff's own motion, and being a consent judgment is not appealable. The others were made on what would constitute good grounds for dismissal, and since the parties have not discussed them, these judgments and orders will be affirmed without discussion here.

Before we reach the merits of the appeal it seems neces-

sary to inquire what defendants were parties to the motion for a nonsuit, or, in other words, in whose favor does the judgment of nonsuit that is appealed from run? The record is not entirely clear on this point. It appeared at the trial that the individual defendants could be divided into three classes with reference to the time of their membership in the lodge; first, those who were members of the unincorporated lodge when the lease was executed, July 1st or 31st, 1926, this class including defendants Thomas Robinson, L. O. Foreman, Joe Vivalda and R. A. Boswell; second, those who joined after the execution of the lease but before the incorporation of the lodge, on July 16, 1930, this class including defendants, M. F. Nelson and Leon Alexander; and third, those who joined after the incorporation, this class including defendant, Samuel Butler. One of the defendants' counsel, who represented a considerable number of them, apparently believing that there might be some difference in the liability of these three classes, filed three separate answers, one for Thomas Robinson, which admitted, by failure to deny, that he was of the first class, one for M. F. Nelson of the second class, and one for Samuel Butler of the third class. Each of these answers stated that the defendant named in it was answering "for himself alone." Then this same counsel entered into four written stipulations with counsel for plaintiff, the first declaring that 57 defendants named therein were within the first of the classes above mentioned, and the other three providing, separately, that each of the answers above mentioned should be "considered and treated" as the answer of certain other named defendants, that of Robinson to serve for the 57 other defendants who were in the same class with him, that of Nelson to serve for 77 other defendants and that of Butler to function for 48 other defendants. It was apparently understood at the trial that the members of the last two groups were, respectively, in the same class as the defendant whose answer was thus adopted for them, although we find no stipulation to that effect. The three stipulations last mentioned also provided that each defendant might introduce evidence on his own case, in addition to the general defense, and that if he failed to do so, judgment in his case should be the same as in case of the defendant whose answers he adopted.

None of these stipulations was filed before the trial. Apparently all were delivered to counsel for the plaintiff,

for after the trial had begun he produced them all and offered them in evidence as exhibits. They were admitted and filed as exhibits. There seems to be plausible ground for questioning whether the production of these exhibits in this way effectively adopted the answers on file for the defendants named in the stipulations. The stipulations were not filed for that avowed purpose, and if they had been it would have been the duty of the clerk to demand and collect an appearance fee for each defendant named in the stipulations before filing them. (Pol. Code, secs. 4295, 4300a.) This does not appear to have been done. Some of the defendants named in the stipulations in fact appeared and filed answers by other counsel and one filed an answer in propria persona, and then appeared at the trial by counsel other than the one signing the stipulation. Some of them also were dismissed before the trial on motions made for them by other counsel. In these cases the stipulations manifestly could not serve as answers. This apparent overlapping of counsel, we suppose, is not the fault of counsel, but probably results from a change of mind on the part of some defendants who, after agreeing to a group defense, concluded to have separate counsel but failed to inform either counsel of the facts. By reason of the condition of the record in other respects we need not pass on the effect of these stipulations, but some attention should be given to the subject in any further proceedings that may be had.

At the conclusion of plaintiff's evidence, the counsel who filed the three answers, Judge Weller, made a motion for a nonsuit, which he stated was "on behalf of the defendants Thomas Robinson, M. F. Nelson and Samuel Butler, separately and individually." Counsel who appeared for defendants Vivalda and Alexander at the trial adopted Judge Weller's motion for their clients, with some additions, and by stipulation previously made it was deemed also to be adopted for defendant Boswell. ▇▇ The minute entry of the order made on these motions is: "Motion by Dana R. Weller for a judgment of non-suit as to the defendants he represents and represents by stipulation is granted and motion by Leon Alexander for a judgment of non-suit is granted. The judgments of non-suit as to other defendants represented at this hearing are also granted. Counsel for defendants to prepare order." In view of the final sentence of this order, as well as its other language, it cannot be regarded

as the appealable judgment herein but is a mere memorandum "affording data from which a proper final judgment might thereafter be drafted." (*Estate of Yale* (1929), 208 Cal. 102, 104 [280 P. 358]; see, also, *Scrimsher* v. *Reliance Rock Co.* (1934), 1 Cal.App.2d 382, 390 [36 P.2d 688]; *McColgan* v. *Jones, Hubbard, etc., Inc.* (1938), 11 Cal.2d 243, 247 [78 P.2d 1010].) Accordingly, the court entered a formal judgment of nonsuit, which is more limited than the minute order. It reads as follows: "This action came on regularly for trial on the 28th day of July, 1941, Messrs. Thomas H. Cannan and Elmer L. Walther, appearing as attorneys for the plaintiff, and James E. Mackel, Esq., for the defendant Joe Vivaldi, William G. Stein, Esq., for the defendant Leon Alexander, Floyd S. Sisk, Esq., for the defendant R. A. Boswell, and Dana R. Weller, Esq., for the defendants Thomas Robinson, M. F. Nelson, Samuel Butler and L. O. Foreman, and plaintiff having introduced evidence and having rested on the 31st day of July, 1941, whereupon the attorneys for the respective defendants above named, separately and individually, having moved the Court for judgment of non-suit on the grounds stated in the motion, and after argument of counsel and due consideration by the Court, said motion having been granted:

"Now therefore, it is ordered and adjudged:

"That said action be and the same is hereby dismissed as to said defendants, and that plaintiff take nothing from them or either of them by reason of this action."

Considering that this judgment conforms to the motions in ordering a dismissal only as to named defendants, we must ignore the greater reach of the minute entry and accept the judgment as expressing the full intent of the court. In view of the fact that counsel who made the motion apparently represented many defendants who could raise the same questions as could those he named, we are disposed to give his motion as liberal a construction as it will reasonably bear in order to extend its benefits to all; but we cannot see how a motion which is expressly limited to three named defendants "separately and individually" can be deemed the motion of other defendants who have merely adopted by stipulation the answer of those three defendants as their own, even if the stipulations can be given that effect here. The result is that as far as the record here shows, no disposition

at all has been made in the trial court of the case as it affects the defendants named in the stipulation and not otherwise appearing at the trial, and such defendants are not before us on this appeal.

It was shown at the trial that at the time the lease was made the unincorporated lodge had from 2200 to 2500 members. As already stated, only 1188 of them were made defendants in this action. ■ One of the grounds on which the motion for a nonsuit was made and granted was that the liability of the members of the lodge, if they were liable, was joint, only, and that hence the action could not be maintained against a part of them only. The objection thus raised is, in substance, that there is a defect of parties defendant. This is an objection which must be raised by demurrer or by answer, or it is waived. (Code Civ. Proc., secs. 430, 433, 434.) Here it was not raised in either mode. Consequently, it was waived, and could not be made the ground of a nonsuit. (*Stackpole* v. *Pacific Gas & Elec. Co.* (1919), 181 Cal. 700, 704 [186 P. 354].)

The motion was made, in part, and the order granting the nonsuit is now defended on the ground that plaintiff is seeking to enforce the rights of a mortgagee in possession of the mortgaged property, and that it is not entitled to do so because it was not in possession of that property when this action was begun. It is undisputed that plaintiff first took possession of the property on June 16, 1937, while this action was begun on June 30, 1936. ■ The rights of the parties in this matter arise out of contract. (*Kinnison* v. *Guaranty Liquidating Corp.* (1941), 18 Cal.2d 256, 262 [115 P.2d 450]; *Title Guarantee & Trust Co.* v. *Monson* (1938), 11 Cal.2d 621, 625, 627 [81 P.2d 944].) ■ Where the contract is simply a mortgage or trust deed, even though it purports to include the rents, issues and profits as security, with the right in the mortgagee, beneficiary or trustee to take possession upon default, the contract does not confer any right to the rents, issues and profits until possession is so taken by the mortgagee, etc., or by a receiver appointed for that purpose. (*Childs etc. Co.* v. *Shelburne Realty Co.* (1943), 23 Cal.2d 263, 268 [143 P.2d 697]; *Kinnison* v. *Guaranty Liquidating Corp., supra,* at page 261; *Bank of America* v. *Bank of Amador County* (1933), 135 Cal.App. 714, 721 [28 P.2d 86]; *Casey* v. *Doherty* (1931), 116 Cal.App. 42, 43

[2 P.2d 495].) ▉ There is nothing in this rule to prevent the parties from making a further contract on the subject, and such a contract is valid as between them (*Kinnison* v. *Guaranty Liquidating Corp., supra,* at pages 262, 263), however it might be as against creditors of the mortgagor or other third parties. In this case the parties did make a further contract by the assignment of lease, from which we have above quoted the principal parts. As far as the "rent" payable under the lease is concerned, the rights granted by this assignment are substantially the same as those provided by the rule above stated. As appears from parts of that assignment above quoted, the original lessor retained therein the right to collect "all rents" until it defaulted and the trustee proceeded, as provided in the trust deed, to collect them. By the provisions of the trust deed, also above quoted, the trustee is entitled to collect the rents only in case it has entered into possession of the property after default. If only "rent" were provided for in the lease, or the assignment carried with it only "rent," plaintiff's rights under the assignment would be as claimed by defendants.

▉ But the assignment is of "all right, title, and interest in and to" the lease, and the lease contains two sets of provisions regarding payments to be made by the lessee thereunder. One of these sets provides for payment of what is denominated as "rent," to which the conclusion above stated applies. But the other series of payments—the interest on the bonds and the sinking fund payments—are not designated in the lease as "rent." They are to be made, it declares, "as further consideration for the leasing of the aforesaid premises" or "as additional consideration for the granting of this lease"—phrases which are identical in meaning. ▉ The lessee may agree in a lease to make payments to the lessor, as additional consideration for the lease, sometimes called a "bonus," which are not to be deemed "rent," even though made in installments, and such agreements are valid. (See *Parigian* v. *Citizens Nat. Tr. & Sav. Bank* (1941), 42 Cal. App.2d 773, 780 [110 P.2d 117] ; *A-1 Garage* v. *Lange Investment Co.* (1935), 6 Cal.App.2d 593, 596 [44 P.2d 681] ; *Wood* v. *Hipwell* (1930), 107 Cal.App. 680, 683 [290 P. 1040].)

▉ In view of the careful segregation and different labeling of the two classes of payments in the lease here involved, the term "rent" in the assignment was undoubtedly intended

and must be construed to include only those payments which were so designated in the lease. This leaves the provision in the lease for payments by the lessee of bond interest and sinking fund unaffected by the limitation in the assignment on the assignee's rights of collection.

The fact that the assignment was for security only does not prevent the assignee from collecting the payments to be made for these items. One who holds the title to a demand, even though only as security, may sue thereon in his own name. (*Kinnison* v. *Guaranty Liquidating Corp., supra* (1941), 18 Cal.2d 256, 262; *Tilden Lumber etc. Co.* v. *Bacon Land Co.* (1931), 116 Cal.App. 689, 693 [3 P.2d 350].)

But, if we disregard the assignment, we see that by the lease itself the lodge agreed with its lessor to make these payments for interest and sinking fund directly to the plaintiff as trustee. This agreement is within the provision of section 1559 of the Civil Code that "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." The only reason advanced by defendants for excluding plaintiff from the operation of this section is that these payments are secured by the trust indenture and hence the plaintiff may not sue for them until it has first exhausted the security. But the trust indenture secured only the agreements of the corporation which was the lessor of the lodge. While that corporation did agree in the trust indenture to make the interest and sinking fund payments to plaintiff, the agreement of the lodge in the lease to make the same payments was its own independent agreement and was not the agreement secured by the trust indenture. An action may be maintained upon any such independent agreement (instances of which are guaranty and endorsement) without foreclosure of a mortgage or trust deed securing the primary debt. (18 Cal.Jur. 242-3; *Loeb* v. *Christie* (1936), 6 Cal.2d 416 [57 P.2d 1303]; *Nuetzel* v. *Mackie* (1927), 80 Cal.App. 768, 775 [253 P. 166]; *Murphy* v. *Hellman Commercial etc. Bank* (1919), 43 Cal.App. 579, 586 [185 P. 485].)

Another ground of the motion was that the individual members of the unincorporated lodge are not bound by the action of its officers in entering into the lease and no liability was cast on them personally thereby. The liability of the members of an unincorporated association on contracts

made by it varies according to the answer to the question whether the association is one organized for profit. Here there is no doubt that the association was not organized for profit. (See *Herald* v. *Glendale Lodge No. 1289* (1920), 46 Cal.App. 325, 328 [189 P. 329], where it was so held of another Elks' lodge whose activities were substantially the same as those of the lodge here.) Such an association is not a partnership and its members are not liable as partners (7 C.J.S. 22, 77). The rule of liability of members of such an association, not organized or conducted for profit, is stated in 7 C.J.S. 78, as follows: "Membership, as such, imposes no personal liability for the debts of the association; but to charge a member therewith it must be shown that he has actually or constructively assented to or ratified the contract on which the liability is predicated. If, however, a member, as such, directly incurs a debt, or expressly or impliedly authorizes or ratifies the transaction in which it is incurred, he is liable as a principal. So a member is liable for any debt that is necessarily contracted to carry out the objects of the association." Similar statements of the rule are made in 4 Am.Jur. 481, 482, and in a note in 7 A.L.R. 222-233, where the matter is discussed at length and many cases are cited in support of the rules stated. A supplemental note on the same point appears in 41 A.L.R. 754. Substantially the same rule was stated in *Leake* v. *City of Venice* (1920), 50 Cal.App. 462, 465 [195 P. 440], by quoting from another case, as follows: "Where the parties unite in a voluntary unincorporated association, and for convenience contract under an associate name, the acts of the association, it not being a legally responsible body, are the acts of its members who instigate and sanction the same." The meaning of the words "constructively assented" in the above quotation from Corpus Juris Secundum is illustrated by the statement of the court in *Richmond* v. *Judy* (1879), 6 Mo.App. 465, that "Persons who organize as a campaign committee on the eve of an election may perhaps be supposed to know that their associates, in the name of the committee, will incur certain obvious expenses in giving notice of political meetings, and to sanction such outlay by the very fact of their organization."

In this case the lease was executed in behalf of the unincorporated lodge by its presiding officer and secretary, after a vote of the lodge at a regular meeting authorizing them to do so. Plaintiff was unable to prove that any of the defen-

dants appearing at the trial was present at that meeting, as far as we can discover by our unaided search of the record. However, 58 of the defendants, including defendants Robinson, Foreman, Vivalda and Boswell, were members of the lodge at the time the lease was executed. All of them had, on joining, signed the by-laws of the lodge. These by-laws contained provision for ''The operation, management and control of the Home or Club occupied by this Lodge.'' ▮ The Constitution and Statutes of the National Order of Elks, which appear to be binding on all individual lodges and the members thereof, provided that ''A Lodge may establish and maintain a home or club, for the social enjoyment of its members . . .'' and set forth in some detail the mode of controlling and managing such a home or club. These provisions of the governing regulations of the order and of the lodge are sufficient to bring the case within the rule above quoted from Corpus Juris Secundum, that members of an association who ''impliedly authorize'' or ''constructively assent to'' a transaction by which a debt is incurred are liable as principals. Or, to use the other form of expression appearing in the same quotation, the establishment and maintenance of a ''home or club'' was one of the objects of the association (lodge). ▮ The lease was executed to accomplish this object and was an appropriate means to that end. Consequently, all who were members of the lodge at the time the lease was executed by the lodge were liable thereon as principals, even though they did not expressly authorize it by appearing at the meeting and voting for the resolution directing its execution.

▮ Defendants seek to avoid this conclusion by the contention that the presiding officer and secretary were not the proper officers of the lodge to execute such a contract in its behalf, claiming that this could be done only by the trustees. In support of their claim they point to section 7 of the by-laws, which provides that the trustees ''shall have the following powers subject to the control of the lodge: they shall have control of the funds, investments and property of the lodge, whether real or personal, not otherwise provided for by law; they shall receive and collect the income and rents from said property, and pay the same through the Secretary of the Lodge; *shall execute all leases, contracts or other papers* necessary or proper in the premises.'' (Emphasis that of defendants.) It is obvious from the context

quoted that the words relied on by defendants have reference to the funds, investments and property of the lodge, and to leases of or contracts regarding such property; not to property of which the lodge might desire to become a tenant in order to provide itself with a home or club. Moreover, the tenure of the enumerated powers by the trustees is "subject to the control of the Lodge"; hence a resolution directing other officers to execute such a lease as we have here would not infringe upon the by-law.

It is contended that when the lodge was incorporated, July 16, 1930, the unincorporated association ceased to exist and the liability of its members upon the lease terminated. That the incorporation of an association works its dissolution is stated in 7 C.J.S. 29 and 5 C.J. 1338, as the rule where all members agree to incorporation. Examination of the cases cited in support of this statement shows that the qualification requiring unanimous consent to incorporation of an association in order to work the dissolution of the latter is applicable only to cases where there is no provision for incorporation in statute or in the governing regulations of the association. Where there is such statutory provision the rule is that stated in *Spiritual & Philosophical Temple* v. *Vincent* (1906), 127 Wis. 93 [105 N.W. 1026], as follows, quoting the syllabus in 105 N.W.: "Where a law authorizing the organization of voluntary associations into corporations is in existence when a voluntary association is formed, it must be deemed to be incorporated into the association agreement by necessary implication, and every member must be conclusively presumed to have impliedly agreed, in joining the association, that it might at any future time be converted into a corporation in accordance with the statutes regulating the matter." There has been provision in the corporation laws of California for the incorporation of associations ever since the enactment of the codes in 1872; we have not checked statutes prior to that time. While the date of organization of the unincorporated lodge does not appear in the record, it must have been later than 1872. The national statutes of the Elks provide that any subordinate lodge may incorporate itself, authorize this to be done on a majority vote of the lodge and declare that when any lodge shall incorporate "the voluntary association shall merge in such Corporation." The incorporation in this case having been thus fully sanctioned by both state law and organizational regulations, full

effect must be given to it. As stated in Corpus Juris Secundum and Corpus Juris at the places above cited, the effect is that the creation of the corporation "ipso facto dissolves the association and transfers its property and rights to the corporation." As stated in *First Russian Nat'l. Organization* v. *Zuraw* (1915), 89 Conn. 616 [94 A. 976, 977]: "Where a voluntary association becomes incorporated under a special charter or general laws, it becomes merged in the corporation, its members become the constituent members of the corporation, and its property becomes the property of the corporation. *Ferris* v. *Strong*, 3 Edw. Ch. (N.Y.) 127, 128." While these authorities were not concerned with the question of debts it must follow from the far reaching character of the merger, as there depicted, that the debts of the association also become the debts of the corporation. The incorporated lodge was bound by the lease after incorporation as previously the unincorporated lodge had been.

ɪ While by incorporation the unincorporated association ceased to exist as such, or was dissolved, as Corpus Juris Secundum puts it, yet this was a mere transmigration of souls, so to speak, whereby the real entity which formerly dwelt in the association became reincarnated in the corporation. No reason appears why such a process should terminate or alter the then existing liability of the members who constitute that real entity. Indeed, even the entire disbanding of an association and cessation of its activities would not, for any reason that occurs to us, terminate the liability of its members on contracts already made by it. If such contracts were binding on its members when made, the members would remain bound after its dissolution, or other termination of their membership, as before. Hence the statute of limitations pleaded by defendants does not afford support for the nonsuit as to all of them. While payments due under the lease at the time of incorporation of the lodge, as well as some later ones, appeared to have been barred by the statute pleaded, when the action was brought, other later payments which had accrued under it were not so barred, and some of the defendants were liable for them.

 But the defendants who became members of the unincorporated lodge after the lease was executed on July 1st or 31st, 1926, are in a different situation. They were not bound by the lease when it was made, and while they could assume such liability, the mere act of joining the lodge would

not constitute such an assumption, and nothing more appears here. In this connection the plaintiff cites *De Motte* v. *Arkell* (1926), 77 Cal.App. 610, 619 [247 P. 254], which holds, and *San Juan G. Co.* v. *San Juan R. etc. Assn.* (1939), 34 Cal. App.2d 159, 168 [93 P.2d 582], which refers to the holding, that where property is leased to an unincorporated association—there, a lodge—all its members become tenants. But, while in the De Motte case the person whose acts were in question became a member of the tenant lodge after the lease was made, the court there was not concerned with the questions, as to how his tenancy arose, and what would end it. At the time in question he was still a member. The case does not hold that by becoming a member of the lodge the person also became a contracting party to the lease. We are satisfied that the tenancy in such a case would arise, not by contract, but by privity of estate, similar to that existing in case of an assignee of a lease who becomes such without an assumption of the lease. Such a person's privity of estate ceases upon his reassigning the lease or surrendering possession of the property (15 Cal.Jur. 754-5). In like manner the tenancy of a lodge member who becomes a member after the lodge has made a lease, must end when he ceases to be a member of the lodge or the lodge ceases to occupy the property. In this case the unincorporated lodge ceased to occupy the property at the date of incorporation, July 16, 1930. Those who became members before this event but after the making of the lease, (July 1st or 31st, 1926) could have no liability under the lease after the incorporation, for reasons hereinafter stated. Their liability, if any, which accrued prior to that event was barred by the four-year statute of limitations which they pleaded, and as to such defendants a nonsuit was proper, no cause for suspending the operation of the statute appearing. (*Wrightson* v. *Dougherty* (1936), 5 Cal.2d 257, 262 [54 P.2d 13].)

 The same principles would not apply to those who became members of the lodge after its incorporation. While the incorporated lodge might be substituted for the unincorporated lodge and in legal effect become the tenant under the lease, it would be a recognized legal entity, capable of holding property in its own name, and reason would no longer exist for holding that the members were the real tenants or stood in any privity of estate with the landlord. Hence no liability as tenants would rest on the members after incor-

poration. Such of them as were members between the date of incorporation and the date of repeal, in 1931, of section 322 of the Civil Code, which formerly imposed on the members of a nonstock corporation a proportionate liability for its debts, doubtless incurred such a liability as members, but this action was not brought to enforce that liability, and if it had been it would have been barred by the statute of limitations, having been brought nearly five years after repeal of the liability statute.

The appeal from the judgments or orders of dismissal in favor of defendants Byron C. Hanna and John Conterno is dismissed. The judgment and order of dismissal in favor of defendant Nicholas Pirolli is affirmed. The judgment of nonsuit is affirmed as to the defendants M. F. Nelson, Leon Alexander and Samuel Butler and, is reversed as to defendants Thomas Robinson, L. O. Foreman, Joe Vivalda and R. A. Boswell.

Desmond, P. J., and Shinn, J., concurred.

Reporter's Note: On February 3, 1944, the opinion and judgment were modified to read as above.